**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

DOUGHERTY *et al.*,

          Plaintiffs,

    v.

ZYNGA, INC.,

          Defendant.

Case No. 1:26-cv-02772-PAE

---

**DEFENDANT ZYNGA, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
<u>**MOTION TO COMPEL ARBITRATION**</u>

**MCDERMOTT WILL & SCHULTE LLP**

Andrew B. Kratenstein
Chris Combs
1 Vanderbilt Avenue
New York, NY 10017
(212) 547-5400
David Saunders (*pro hac vice* forthcoming)
Emilie O'Toole (*pro hac vice* forthcoming)
444 West Lake Street
Chicago, IL 60606
(312) 372-2000

*Attorneys for Defendant Zynga, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ..................................................................................................................2

    I.    THE PARTIES...................................................................................................2

    II.   PLAINTIFFS' ALLEGATIONS ........................................................................2

    III.  THE GAMES....................................................................................................3

          A.    The Terms ............................................................................................4

          B.    Plaintiffs' Notice and Acceptance of the Terms.........................................9

          C.    The Previous Arbitrations Against Take-Two ..........................................10

ARGUMENT......................................................................................................................12

    I.    THE FEDERAL ARBITRATION ACT'S STRONG POLICY
        FAVORING ARBITRATION APPLIES .................................................................12

    II.   PLAINTIFFS ARE BOUND BY THE TERMS ....................................................13

          A.    That the Terms Apply is Law of The Case ................................................13

          B.    Plaintiffs Were on Notice of and Assented to the Terms...........................14

          C.    Camargo and Garcia Are Bound by the 2024 Take-Two
               Terms' Arbitration Agreement .................................................................16

          D.    Dougherty's Opt Out of the 2025 Take-Two Terms'
               Arbitration Agreement Was Invalid and, Even if Valid, She
               is Bound to the 2024 Take-Two Terms'
               Arbitration Agreement .............................................................................17

    III.  PLAINTIFFS SHOULD BE COMPELLED TO ARBITRATE
        BEFORE JAMS .................................................................................................18

           A.    The Terms Contain Valid Arbitration Agreements ...................................19

          B.    The Terms Contain Valid Delegation Clauses...........................................19

          C.    The Terms' Arbitration Provisions Are Not
               Unconscionable.......................................................................................21

          D.    Each Plaintiff Must Arbitrate Their Claims on an Individual
               Basis.......................................................................................................24

CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Physicians, S.C. v. Nat'l Football League*,
2020 WL 4731960 (N.D. Tex. Aug. 14, 2020)..........................................................................14

*Akhter v. Compass Grp. USA, Inc.*,
No. 22-CV-2194 (JMF), 2022 WL 4638635 (S.D.N.Y. Sept. 30, 2022)..................................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................17

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ................................................................................................................. 13

*Brower v. Gateway 2000, Inc.*,
246 A.D.2d 246 (1st Dep't 1998) ............................................................................................22

*Corsello v. Verizon N.Y., Inc.*,
976 F. Supp. 2d 354 (E.D.N.Y. 2013) .....................................................................................25

*Davitashvili v. Grubhub Inc.*,
131 F.4th 109 (2d Cir. 2025) ...................................................................................................21

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) ........................................................................................14, 15, 16

*Edwards v. CVS Health Corp.*,
714 F. Supp. 3d 239 (S.D.N.Y. 2024).......................................................................................18

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)..................................................................................................................24

*Feld v. Postmates, Inc.*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020)..........................................................................15, 16, 19

*Galli v. PricewaterhouseCoopers LLP*,
No. 20 CIV. 01640 (LGS), 2020 WL 8768079 (S.D.N.Y. Aug. 12, 2020).............................21

*Gary Friedrich Enters., LLC. v. Marvel Enters., Inc.*,
2008 WL 4129640 (S.D.N.Y. Sept. 4, 2008)...........................................................................14

*Glover v. Bob's Disc. Furniture, LLC*,
621 F. Supp. 3d 442 (S.D.N.Y. 2022).......................................................................................22

*Green Tree Fin. Corp.-Ala. v. Randolph*,
   531 U.S. 79 (2000).........................................................................................................13

*Guerrero v. GoPuff*,
   No. 24 CIV. 6727 (JHR) (GS), 2025 WL 3539105 (S.D.N.Y. Dec. 10, 2025).................20, 22

*Haider v. Lyft*,
   No. 20-cv-2997 (AJN), 2022 WL 1500673 (S.D.N.Y. May 11, 2022) ....................................18

*Hamilton v. Uber Techs., Inc.*,
   No. 22-CV-6917 (PGG) (OTW), 2023 WL 5769500 (S.D.N.Y. Sept. 7, 2023) .....................19

*Hastings v. Nifty Gateway, LLC*,
   724 F. Supp. 3d 241 (S.D.N.Y. 2024).....................................................................................15

*Heckman v. Live Nation Entm't, Inc.*,
   120 F.4th 670 (9th Cir. 2024) ......................................................................................22, 23, 24

*Hidalgo v. Amateur Athletic Union of United States, Inc.*,
   468 F. Supp. 3d 646 (S.D.N.Y. 2020).....................................................................................19

*Keebaugh v. Warner Bros. Ent. Inc.*,
   100 F.4th 1005 (9th Cir. 2024) ...............................................................................................15

*Kelly-Starkebaum v. Papaya Gaming Ltd.*,
   No. 24-cv-2310 (DLC), 2024 WL 5135799 (S.D.N.Y. Dec. 17, 2024) .............................16, 21

*KPMG LLP v. Cocchi*,
   565 U.S. 18 (2011).....................................................................................................................13

*Kutluca v. PQ New York Inc.*,
   266 F. Supp. 3d 691 (S.D.N.Y. 2017).....................................................................................13

*Lamps Plus, Inc. v. Varela*,
   587 U.S. 176 (2019)...................................................................................................................13

*Marino v. CVS Health*,
   698 F. Supp. 3d 689 (S.D.N.Y. 2023)................................................................................18, 20

*Pelligrino v. Morgan Stanley Smith Barney LLC*,
   No. 17-CV-7865 (RA), 2018 WL 2452768 (S.D.N.Y. May 31, 2018) ..................................18

*Saizhang Guan v. Uber Techs., Inc.*,
   236 F. Supp. 3d 711 (E.D.N.Y. 2017) ...................................................................................21

*Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010)..................................................................................................................24

iii

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ......................................................................16

*United States v. Aquart*,
    92 F.4th 77 (2d Cir. 2024) ......................................................................................14

*Wu v. Uber Techs., Inc.*,
    43 N.Y.3d 288 (2024) .............................................................................................21

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 2 ...........................................................................1, 3, 8, 13

## PRELIMINARY STATEMENT

This case does not belong in this Court.  Plaintiffs are allegedly users of the mobile games Toon Blast and/or Toy Blast (the "Games") published by Defendant Zynga Inc. ("Zynga"). Each Plaintiff knowingly agreed to Terms of Service (the "Terms") issued by Zynga's parent company, Take-Two Interactive Software, Inc. ("Take-Two").  Take-Two's Terms govern the Games and include a clear, enforceable arbitration agreement.

Plaintiffs allege they made in-Game purchases on one or both Games.  To make these purchases, Plaintiffs were required to accept the Terms by clicking "Accept" when prompted by conspicuous, straightforward notices upon launching the Games.  These disclosures were not passive or obscure; they were unavoidable gateways to gameplay, supported by hyperlinks to the applicable Terms in blue, underlined text, and a bolded warning at the top of the Terms highlighting that arbitration was mandatory.  Thus, Plaintiffs are contractually bound to resolve their claims against Zynga through arbitration.

In fact, Plaintiffs' counsel previously sought to arbitrate the same claims on behalf of hundreds of claimants.  Those claims were initially referred by JAMS ADR ("JAMS") to a Mass Arbitration Process Administrator.  After receiving that referral notice, Plaintiffs' counsel dismissed the arbitrations and – in violation of the Terms' arbitration, forum selection, and class action waiver clauses – filed this case in the Northern District of California as a class action.

Such forum-shopping is impermissible under the Federal Arbitration Act and binding precedent.  Plaintiffs' claims all "arise from or relate to" the Games and related in-Game functions, which are all services governed by the Take-Two Terms.  Moreover, the Terms include a valid delegation clause – assigning questions of arbitrability to the arbitrator.  Plaintiffs' attempt to sidestep these provisions ignores controlling law and seeks to rewrite the contract they voluntarily

1

accepted.  Zynga respectfully requests that this Court enforce the parties' agreement – as federal law and precedent require – and compel Plaintiffs to arbitrate their individual claims before JAMS.

## BACKGROUND

### I.    THE PARTIES

Zynga is a video game developer and publisher, founded in 2007 with its headquarters in San Mateo, California.  (FAC ¶¶ 17, 21.)  As of May 2022, Zynga is a wholly-owned subsidiary of Take-Two, a video game publisher.  (*Id.* ¶ 2.)  Zynga is the publisher of the Games.  (*Id.*)

Plaintiffs Cheryll Dougherty ("Dougherty") and Delia Camargo ("Camargo") allege they are California residents.  (*Id.* ¶¶ 12-13.)  Dougherty alleges she currently plays Toon Blast and previously played Toy Blast.  (*Id.* ¶ 12.)  She further alleges that she "recalls watching video advertisements in Toon Blast within the past two years."  (*Id.*)  Camargo alleges she plays Toon Blast "about three times a month" and has played the Game for about eight years.  (*Id.* ¶ 13.)  Plaintiff Lawrence Garcia ("Garcia") alleges that he was a California resident until August 2024.  (*Id.* ¶ 14.)  Garcia alleges that, while he was a resident of California, he made in-app purchases and watched pre-recorded video content in Toon Blast.  (*Id.* ¶¶ 14-15.)

### II.    PLAINTIFFS' ALLEGATIONS

Plaintiffs allege that the Games are marketed as free, but pressure players to make in-Game purchases of Coins, Boosters, and Bundles to advance through the Games' levels.  (FAC ¶ 3.)  The alleged pressure includes advertised discounts on in-app purchases and purportedly "fake" countdown timers for the sales.  (*Id.* ¶¶ 5-6).  Plaintiffs also allege that the Games are addictive and that these in-Game purchases perpetuate the Games' alleged addictive nature.  (*Id.* ¶ 7.)

On behalf of themselves and a purported class of Game players, Plaintiffs allege six counts against Zynga for:  (1) violations of the Unfair Competition Law ("UCL"); (2) violations of the False Advertising Law ("FAL"); (3) violations of the Consumer Legal Remedies Act ("CLRA");

(4) fraud; (5) unjust enrichment; and (6) violations of the federal Video Privacy Protection Act ("VPPA") (brought by Plaintiffs Dougherty and Garcia only).  (*Id.* ¶¶ 179-245.)  Plaintiffs seek compensatory and actual damages, statutory damages, punitive damages, civil penalties, injunctive, declaratory, and equitable relief, costs, attorneys' fees, and interest.  (*Id.* at 50-51.)

## III.    THE GAMES

Toy Blast and Toon Blast were created and released by Peak Games ("Peak") in 2015 and 2017, respectively.  (Declaration of Andrew J. Ungberg, dated April 23, 2026 ("Ungberg Decl.") ¶ 5.)  In July 2020, Zynga acquired Peak.  (*Id.*)  In May 2022, Take-Two acquired Zynga.  (*Id.*)

Both Games are puzzle games played primarily on mobile devices.  (*Id.* ¶ 6.) Players progress through each level by "blasting" adjacent matching tiles off the board over a set number of turns.  (*Id.*)  Each level has a designated goal requiring players to clear the puzzle over a set number of moves.  (*Id.* ¶ 7.)  Players may run out of lives if they fail multiple levels in a given time frame.  (*Id.*)

To aid their progress, both Games have an in-app shop (the "Shop") where players purchase Coins.  (*Id.* ¶ 8.)  The Coins can purchase additional lives, more moves to complete a level, or special items ("Boosters"), such as cartoon bombs or rockets that players can use to blast through entire rows and columns or other obstacles.  (*Id.*)  Players can also purchase packs that include various combinations of Coins, Boosters, and other bonuses, such as unlimited lives for a set period ("Bundles") that may be offered at a discounted price.  (*Id.*)

Since at least 2018, both Games have required all players to accept the operative Terms at the time they are loaded and before they can be played or in-app purchases can be made.  (*Id.* ¶ 15.) After downloading the Games from the player's chosen app store, a notice appears the first time a player opens the Games, informing the player that by clicking "Accept" they are agreeing to the

applicable Terms of Service. (*Id.* ¶ 16.)  The notices feature hyperlinks to the applicable Terms that appear in blue, underlined font that stands out from the plain background.  (*Id.*)

These notices have appeared in substantially the same form since they were added to the Games in 2018 and have included hyperlinks to the operative Terms.  (*Id.* ¶ 17.)  When the Terms are updated, a pop-up notice appears when a player opens the Games.  (*Id.* ¶ 19.)  The notice informs players that the Terms have been updated, and the player must click "Accept" before proceeding to play the Games.  (*Id.* ¶¶ 15-19.)  No player can play a Game unless they select the "Accept" button.  (*Id.*)

### A.    The Terms

After Peak was acquired by Zynga in July 2020, the Games continued using the Peak Terms that had been in effect since 2018 (the "Peak Terms").  (Ungberg Decl. ¶ 21.)  The Peak Terms are governed by Turkish law and select Turkish courts as the applicable forum.   (*Id.* ¶ 22.) The Peak Terms also included a class action waiver and a severability clause.  (*Id.* ¶¶ 22-23.) Camargo and Garcia both accepted the Peak Terms.  (*Id.* ¶¶ 66, 70.)

The Peak Terms remained in effect for both Games until February 28, 2024, when the 2024 Take-Two Terms of Service (the "2024 Take-Two Terms") were implemented across Take-Two companies' games, including the Games.  (*Id.* ¶ 25.)  To notify players of the upcoming change from the Peak Terms to the 2024 Take-Two Terms, a new pop-up notice appeared when a player opened either Game beginning on or around January 25, 2024.  (*Id.* ¶ 28.)  The notice informed players that they would have to accept the new terms to continue playing the Game after

February 28, 2024.  (*Id.* ¶¶ 28-29)  On or after February 28, 2024, that new pop-up notice began appearing for all players the first time they played the game after that date:



(*Id.* ¶ 29.)  The 2024 Take-Two Terms were linked in the pop-up notices at the blue, underlined text. (*Id.*)

On February 28, 2025, Take-Two implemented new Terms of Service (the "2025 Take-Two Terms") across its full line of products, including the Games.  (*Id.* ¶ 38.)  The 2025 Take-Two Terms were introduced in the Games on March 28, 2025.  (*Id.* ¶ 39.)  That day, a new pop-up notice appeared to provide notice of the 2025 Take-Two Terms and required players to select "ACCEPT" before continuing into Toon Blast or Toy Blast.  (*Id.* ¶ 40.)

5

 

(*Id.*)

The 2024 and 2025 Take-Two Terms contain several relevant provisions. First, both versions of the Terms state that they apply to Take-Two "games, apps, products, websites, and other services (the 'Services') as well as Virtual Items[1] . . . and your Account[2]":

> Take-Two Interactive Software, Inc. is a global company headquartered at 110 W. 44th Street, New York, NY 10036, United States of America whose group includes all Take-Two entities and labels (collectively "**Take-Two**," "**we**," "**us**," and "**our**"). These Terms of Service ("**Agreement**") cover the terms and conditions under which we offer you access to use our games, apps, products, websites, and other services (the "**Services**") as well as Virtual Items

---

[1] A "Virtual Item" is "any virtual currency, goods, items, boosts, or effects such as, but not limited to, coins, points, gems, tokens, weapons, vehicles, cards, skins, power-ups, apparel, equipment, trophies, rewards, badges, or any other in-game virtual asset made available, purchased from a Digital Storefront, earned, or otherwise acquired through the Services." (Ungberg Decl. Ex. B § 3, Ex. C § 4.)

[2] "Some elements of the Services may require that you create an account, whereas for other Services, an account may be automatically created for you when you access the Services for the first time (each an 'Account')." (Ungberg Decl. Ex. B § 1.3, Ex. C § 1.2.)

6

(as defined in Section 4 below) and your Account (as explained in Section 1.2 below).  This Agreement is a legal contract between you and Take-Two. By accessing our Services, you are agreeing to be bound by the terms of this Agreement.

(*Id.* Ex. B at 1, Ex. C at 1.)  The hyperlink that appears in blue, underlined font above takes users to a list of all entities included in "Take-Two" as defined in the Take-Two Terms. (*Id.*)  That list includes Zynga.  (*Id.*)

The 2024 and 2025 Take-Two Terms each contain an arbitration provision.  The arbitration provision requires individual arbitration of "any dispute, claim, or controversy arising from or related to the Services."  (*Id.* Ex. B § 15.5(1), Ex. C§ 17.5(1).)  The arbitration provision in the 2024 Take-Two Terms states:

> **(1) Binding Individual Arbitration.**  You and Take-Two agree that, if not resolved through the informal negotiation process described below, any Disputes between us shall be exclusively resolved by individual, binding arbitration under this Arbitration Agreement.  Subject to the exclusions in Section 15.5(10), a "**Dispute**" means any dispute, claim, or controversy arising from or related to the Services, including those related to the formation, breach, termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement, or your rights under those agreements.  All Disputes are subject to the Arbitration Agreement regardless of whether they arose before or after you accepted the Agreement.

(*Id.* Ex. B § 15.5(1).)  The 2025 Take-Two Terms contain a substantially similar arbitration provision, which states:

> (1) **Agreement to Binding Individual Arbitration.**  Subject to the claims excluded in Section 17.5(9), a "**Dispute**" means any dispute, claim, or controversy arising from or related to the Services, including related to the formation, breach, termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement, or your rights under those agreements.  If you and Take-Two cannot resolve your Dispute through the informal negotiation process in Section 17.5(4), we agree that any Disputes between us shall be exclusively resolved by individual binding arbitration under this Arbitration Agreement.  All Disputes are subject to the terms in this Arbitration Agreement, the U.S. Federal Arbitration Act, and federal arbitration law.  This Arbitration Agreement applies to all Disputes between the parties whether the Dispute arose before or after the parties accepted this Agreement.

(*Id.* Ex. C § 17.5(1).)  In addition, at the beginning of both versions of the Take-Two Terms, a notice warns users that the Take-Two Terms contain a mandatory arbitration provision.  (*Id.* Ex. B at 1, Ex. C at 1.)  It also notifies users of their ability to opt out of the arbitration agreement.  (*Id.*)

Both the 2024 and 2025 Take-Two Terms contain a delegation clause.  The 2024 Take-Two Terms specifically grant the arbitrator:

> [E]xclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable.  The arbitrator shall also have authority to determine all threshold arbitrability issues, including related to whether the Agreement or the Arbitration Agreement are unconscionable or illusory; whether the Arbitration Agreement has been disaffirmed under applicable law; and any defense to arbitration including waiver, delay, laches, or estoppel.

(Ungberg Decl. Ex. B § 15.5(1); *see also id.* Ex. C § 17.5(1).)

Both Take-Two Terms also include a class action waiver, prohibiting users from litigating their claims on a class basis and requiring individual arbitration.  (*Id.* Ex. B § 15.5(2), Ex. C § 17.5(2).)  Both Terms require the parties to arbitrate individually before JAMS under the JAMS' Streamlined Arbitration Rules and Procedures (the "JAMS Streamlined Rules").  (*Id.* Ex. B §§ 15.5(4)-15.5(6), Ex. C §§ 17.5(4)-(17.5(6)).)  For any mass arbitration, the 2025 Terms apply the JAMS Mass Arbitration Procedures (the "JAMS MAP") while the 2024 Terms apply the New Era ADR Rules (the "New Era Rules") in effect at the time the mass arbitration is filed.  (*Id.* ¶ 42.)  The 2025 Take-Two Terms also clarify what user content and conduct is acceptable in Take-Two's products and updates to Take-Two's policies concerning moderating content created by users using Take-Two's products or services that may contain harmful or illegal content, and users' appeal process.  (*Id.* ¶ 43.)

The Terms also contain a nearly identical New York choice of law and forum selection clause. It requires any disputes to be litigated in New York state or federal court in New York County under New York law. (*Id.* Ex. B § 15.1, Ex. C § 17.1.)

Finally, the Terms contain nearly identical opt-out provisions, allowing a player to opt out of the Terms within 30 days of accepting them if proper notice is given. (*Id.* ¶¶ 44-47.) In addition, the 2025 Take-Two Terms includes language that clarifies the scope of a player's opt out and states that a player who opts out of the 2025 Arbitration Agreement must still arbitrate under the 2024 Terms of Services if the player accepted them:

> For clarity, if you accepted a previous version of the Arbitration Agreement and did not Opt Out, your Opt-Out Notice will be limited to the materially updated terms of this version. In this case, You and Take-Two, will still arbitrate any Dispute under the terms of the Arbitration Agreement as of the date you first agreed to it or the effective date of the last version of the Arbitration Agreement.

(*Id.* ¶ 47.) Thus, any Plaintiff who validly opted out of the 2025 Take-Two Terms would still be bound by the 2024 Take-Two Terms to which they previously agreed. (*Id* ¶ 48.)

**B.      Plaintiffs' Notice and Acceptance of the Terms**

When a player downloads either of the Games and accepts the operative Terms, he or she is assigned a unique user identification string of numbers and/or letters in the Game (the "User ID"). (Ungberg Decl. ¶ 49.) The User ID is the primary way for Take-Two to track a player's actions in the Games, including acceptance of the applicable Terms. (*Id.* ¶ 50.) By downloading and using the Toon Blast and/or Toy Blast apps, each Plaintiff was notified of and accepted the Terms. Specifically:

Dougherty downloaded Toon Blast on June 20, 2024, and accepted the 2024 Take-Two Terms at the same time. (*Id.* ¶ 59.) On April 21, 2025, Dougherty also accepted the 2025 Take-Two Terms using Toon Blast. (*Id.* ¶ 60.)

Camargo downloaded Toy Blast on July 18, 2016.  (*Id.* ¶ 66.)  She then accepted the Peak Terms on at least June 10, 2019.  (*Id.*)  Camargo accepted the 2024 Take-Two Terms on April 23, 2024, and the 2025 Take-Two Terms on April 18, 2025.  (*Id.*)

Garcia downloaded Toon Blast on September 14, 2018, and accepted the Peak terms that same day.  (*Id.* ¶ 70.)  Garcia accepted the 2024 Take-Two Terms on November 21, 2024, and accepted the 2025 Take-Two Terms on April 17, 2025.  (*Id.*)

Plaintiffs' counsel sent Take-Two 624 notices opting out of the arbitration clause of the 2025 Take-Two Terms.  (*Id.* ¶ 53.)  Camargo and Garcia each sent opt-out notices dated April 25, 2025.  (*Id.* ¶¶ 64, 68.)  Garcia also sent a previous opt-out notice dated April 15, 2025.  (*Id.* ¶ 68.)  Dougherty sent opt-out notices dated April 17, 2025, and June 17, 2025.  (*Id.* ¶¶ 56-57.)  No Plaintiff opted out of the arbitration clause of the 2024 Take-Two Terms.  (*Id.* ¶¶ 56-71.)

**C.    The Previous Arbitrations Against Take-Two**

On July 30, 2024, Take-Two received a letter from Janove PLLC and Hartley Law PLLC (the "Demand Letter").   (Declaration of Andrew B. Kratenstein, dated April 24, 2026 ("Kratenstein Decl.") ¶ 3, Ex. A.)  Purportedly sent on behalf of 2,668 current or former players of the Games, the Demand Letter alleged that the Games falsely advertised "sales" or "discounts" for its in-app purchases and were instead "false incentives to lure customers into making more purchases and spending more money."  (*Id.* ¶ 4.)

On August 27, 2024, on behalf of Take-Two and the arbitration Claimants, their respective counsel executed a Tolling Agreement (the "Tolling Agreement").  (*Id.* ¶ 6.)  Throughout the rest of 2024, Take-Two and Claimants exchanged information related to Claimants' claims.  (*Id.* ¶ 7.)  On December 17, 2024, the parties engaged in confidential in-person mediation through JAMS but were unable to resolve their dispute.  (*Id.* ¶ 8.)  After the mediation, the parties continued their

confidential settlement discussions and extended the Tolling Agreement, which ultimately expired without resolution. (*Id.* ¶¶ 9-10.)

On March 24, 2025, Claimants' counsel filed 746 individual Demands for Arbitration (the "Demands") under the JAMS Streamlined Rules.[3] (*Id.* ¶ 11.) The Demands sought to arbitrate each Claimant's claims under the 2019 Take-Two End User License Agreement (the "2019 EULA"), which called for individual arbitrations under the JAMS Streamlined Rules. (*Id.* ¶ 13.) Each Claimant alleged that, under the 2019 EULA, Take-Two had agreed to pay all arbitration costs above that which Claimant would pay to participate in litigation in court, and that Take-Two was required to pay all JAMS fees and costs in excess of $1. (*Id.*) The filing fees under the JAMS Streamlined Rules would have resulted in Take-Two paying approximately $1.5 million in individual arbitration fees alone, exclusive of other arbitration fees and costs. (*Id.*)

In response, Take-Two explained to JAMS that the 2019 EULA was never the Games' operative Terms of Service. (*Id.* ¶ 14.) After Take-Two acquired Zynga, the Games continued to require players to accept the Peak Terms from June 2018 until February 2024. (Ungberg Decl. ¶¶ 25-26.) Depending on when each Claimant last played the Games, the Peak Terms, the 2024 Take-Two Terms, or the 2025 Take-Two Terms applied. (Kratenstein Decl. ¶ 14.) As discussed above, the 2024 and 2025 Take-Two Terms both designate the JAMS Streamlined Rules for *individual* arbitrations, but the 2025 Take-Two Terms define *mass* arbitrations as 25 or more disputes that share common issues and legal representatives and require Claimants to proceed under the JAMS MAP while the 2024 Terms require that mass arbitrations proceed under the New Era Rules. (*Id.* ¶¶ 15-16.)

---

[3] None of the Plaintiffs filed an arbitration demand against Take-Two. (FAC ¶ 159) ("some of the Arbitration Claimants (*not including Plaintiffs*) filed their claims in JAMS") (emphasis added). And no named Plaintiff filed an arbitration demand against Zynga.

11

On May 6, 2025, JAMS sent the parties a Notice, which stated that JAMS would designate a Process Administrator under the JAMS MAP, upon receipt of the JAMS MAP filing fee. (*Id.* ¶ 18., Ex. B.)  The notice added that "[t]he parties may raise preliminary and procedural matters, including whether the JAMS MAP apply and which Demands if any should be included as part of a Mass Arbitration under the JAMS MAP, with the Process Administrator."  (*Id.* ¶ 18, Ex. B.)  No longer able to use the threat of paying exorbitant arbitration fees to pressure Take-Two and Zynga into a settlement, on May 9, 2025, Claimants' counsel withdrew its 746 pending arbitration claims and filed the Complaint in the U.S. District Court for the Northern District of California the same day.  (*Id.* ¶ 19.)

## ARGUMENT

### I. THE FEDERAL ARBITRATION ACT'S STRONG POLICY FAVORING ARBITRATION APPLIES

The Terms are subject to the Federal Arbitration Act, 9 U.S.C. § 2 (the "FAA"), as the Terms are written contracts "evidencing a transaction involving commerce" and both versions incorporate the FAA.  (Ungberg Decl. Ex. B § 15.5(4), Ex. C § 17.5(1).)  The FAA was enacted by Congress to overcome "widespread judicial hostility to arbitration agreements," and to ensure that courts enforce valid agreements to arbitrate.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 344 (2011) ("The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."); *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011).  Any arbitration agreement within the scope of the FAA "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.

The party seeking to compel arbitration bears the burden of proving the existence of a valid agreement to arbitrate by a preponderance of the evidence.  *Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691, 700-701 (S.D.N.Y. 2017).  A court's role in resolving a motion to compel

arbitration is limited to determining "whether: (1) the parties entered into a valid agreement to arbitrate; and (2) the dispute falls within the scope of the arbitration agreement." *Id.* at 699. Once an agreement to arbitrate has been established, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.- Ala. v. Randolph*, 531 U.S. 79, 91 (2000). Given the strong policy favoring arbitration, "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019). Class action waivers in arbitration agreements are also valid and enforceable, and a plaintiff cannot avoid arbitration based on the presence of a class action waiver. *Concepcion*, 563 U.S. at 351.

## II.    PLAINTIFFS ARE BOUND BY THE TERMS

A user is bound to terms of an online contract "if (1) a reasonably prudent person would be on *inquiry* notice of the terms and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person would understand to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (internal citations omitted). The evidence shows – and the transferor court agreed – that, by downloading or accessing either Game on their mobile phones, Plaintiffs were on notice of and assented to both the 2024 and 2025 Take-Two Terms.

### A.    That the Terms Apply is Law of The Case

In granting Zynga's motion to transfer venue, the transferor court concluded that all three Plaintiffs were on notice of and assented to the 2024 and 2025 Take-Two Terms. As the transferor court noted, "To reach any of the substantive issues the parties raise – whether on the question of the Terms' venue or arbitration provisions – the Court first must be assured that a valid contract was formed." (ECF No. 56 at 5.) Based on the facts presented, the transferor court concluded Plaintiffs "all accepted the 2024 Take-Two Terms and accepted but then opted out of (or attempted to opt out of) the 2025 Take-Two Terms," thereby forming valid contracts with Zynga. (*Id.* at 3-

4.)  Critically, as the transferor court noted, Plaintiffs have not disputed that they accepted both the 2024 and 2025 Terms.  (*Id.* at 5-7.)  This conclusion is now the law of the case. *See United States v. Aquart*, 92 F.4th 77, 93 (2d Cir. 2024) ("The law of the case will be disregarded only when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated"); *Gary Friedrich Enters., LLC. v. Marvel Enters., Inc.*, 2008 WL 4129640, at *3 (S.D.N.Y. Sept. 4, 2008) ("the law of the case doctrine discourages a transferee court from reexamining the determinations of the transferor court"); *Advanced Physicians, S.C. v. Nat'l Football League,* 2020 WL 4731960, at *3 (N.D. Tex. Aug. 14, 2020) (concluding that the court should follow the decision of the transferor court to avoid a "vicious circle of litigation.").

### B.    Plaintiffs Were on Notice of and Assented to the Terms

There is no basis to disturb the transferor court's ruling.  Plaintiffs are bound to the Terms because (1) notices of the Terms were reasonably conspicuous to Plaintiffs and (2) Plaintiffs unambiguously assented to the 2024 Take-Two Terms by selecting the "Accept" button upon opening the Games after the Terms were updated.  (Ungberg Decl. ¶¶ 15-19.)

The in-game pop-ups provided sufficient notice to Plaintiffs of the Terms.  For a reasonably prudent person to be on notice of an app's terms of use, the terms must be reasonably conspicuous. *Edmundson*, 85 F.4th at 704 ("A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way.").  Notice is reasonably conspicuous where the hyperlink to the full terms is readily apparent and presented in a clear, visible format based on the totality of the circumstances.  *Id.* at 705-07.

Here, the notices of the Terms appeared on a white background in front of the more colorful game screen.  (Ungberg Decl. ¶¶ 29, 40.)  The font is in black, contrasting with the white

14

background, with hyperlinks in blue, underlined font.  (*Id.*)  The notice language and hyperlinks are also close to the "Accept" button.  (*Id.*)

Courts have found similar notices to be sufficiently conspicuous.  *See, e.g.*, *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1009 (9th Cir. 2024)  (holding that notice that informed players of app-based game that selecting "Play" would bind them to terms of use was sufficiently conspicuous); *Hastings v. Nifty Gateway, LLC*, 724 F. Supp. 3d 241, 249 (S.D.N.Y. 2024) (holding that notice was conspicuous where "'Terms and Conditions' is directly above the 'sign up' button, in blue, underlined, and links to [defendant's] terms of use"); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830-32 (S.D.N.Y. 2020) (holding that notice was reasonably conspicuous where it appeared on a contrasting background and used a darker, bolder font for hyperlinks).

Beyond visual considerations, the context of Plaintiffs' transactions also supports a finding that notice was sufficiently conspicuous.  Plaintiffs were not required to sign-up for accounts to play the Games, but the context of the transactions at issue demonstrates a continuing relationship with Zynga, which would be governed by an agreement, because Plaintiffs downloaded the app to play the Games and repeatedly played them.  (Ungberg Decl. ¶¶ 59, 66, 70.)  *See Edmundson*, 85 F.4th at 707 (finding context of internet transaction involving a continuous relationship supported conspicuous notice of terms).  Plaintiffs themselves allege they made multiple in-app purchases.  (FAC ¶¶ 12-14.)  Thus, Plaintiffs were on notice of the Terms.

Plaintiffs likewise assented to the Terms.  (Ungberg Decl.  ¶¶ 59, 66, 70.)  Courts find assent where users were on notice that their actions would result in an enforceable agreement.  *See, e.g.*, *Edmundson*, 85 F.4th at 708 (finding user assent where user clicked "Confirm and Continue" directly below express statement of assent to terms); *Kelly-Starkebaum v. Papaya Gaming Ltd.*, No. 24-cv-2310 (DLC), 2024 WL 5135799, at *7 (S.D.N.Y. Dec. 17, 2024)

(holding that a reasonable consumer is "clearly warned" of assent where notice says "By continuing" he is assenting to the terms); *Feld*, 442 F. Supp. 3d at 830-32 (holding that plaintiff manifested assent to Terms of Service by clicking "Sign Up" where the platform indicated by clicking sign up users are agreeing to such terms); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (finding plaintiff had opportunity to review terms of service in a hyperlink immediately under the "I accept" button, which she clicked, so she had notice and is subject to the arbitration agreement).   Plaintiffs' pressing the "Accept" button when presented with a valid notice of the Terms or updates to the Terms constitutes a valid acceptance. (Ungberg Decl. ¶ 40.)[4]

### C.      Camargo and Garcia Are Bound by the 2024 Take-Two Terms' Arbitration Agreement

As the transferor court observed, there is no dispute that Camargo and Garcia timely opted out of the arbitration agreement in the 2025 Take-Two Terms by sending opt-out notices on

---

[4] Plaintiffs allege that Take Two "entrap[ped]" the arbitration claimants, including Garcia, "by forcing notice and assent to" the 2025 Take-Two Terms by updating the terms during the pendency of the arbitration.  (FAC ¶¶ 163-64.)  But, as Plaintiffs' own allegations show, Plaintiffs were able to opt out of the 2025 Take-Two Terms by following their opt-out requirements.  (*Id.* ¶ 165.)  This fact negates any alleged "entrapment."  Plaintiffs also contend that the 2025 Take-Two Terms were created "solely in reaction to the contemplated arbitrations and specifically to prevent the Arbitration Claimants from seeking redress in arbitration."  (*Id.*)  This assertion ignores that the 2025 Take-Two Terms contain significant changes to sections other than the Arbitration Agreement therein, including substantial updates to Take-Two's content moderation policies.  (Ungberg Decl. ¶ 42.)  The notion that Take-Two would make material changes to its terms of service across its entire universe of products and services solely in response to this lawsuit is non-sensical.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (noting that a court should "draw on its judicial experience and common sense" when determining whether a plaintiff alleges a plausible claim for relief).  Plaintiffs also allege that "in the spring of 2025," the hyperlink to the Terms of Service that appeared in the pop-up on Toy Blast only "was broken."  (FAC ¶ 144 n.28.)  But no Plaintiff alleges they played Toy Blast in 2025, and Plaintiffs allege no issues with the link to the Terms of Service in any Toon Blast pop-ups in 2024 or 2025.  (*Id.* ¶¶ 12-14.)

April 25, 2025.[5]  (ECF No. 56 at 6; Ungberg Decl. ¶¶ 67, 71.)  But both Camargo and Garcia are still bound to the arbitration agreement in the 2024 Take-Two Terms.[6]  The 2025 Take-Two Terms state that if a player validly opts out of the of the arbitration agreement, "You and Take-Two, will still arbitrate any Dispute under the terms of the Arbitration Agreement as of the date you first agreed to it or the effective date of the last version of the Arbitration Agreement."  (Ungberg Decl. ¶ 47.)  Thus, the arbitration agreement in the 2024 Take-Two Terms applies to Camargo's and Garcia's claims given their valid assent to these terms.  (*Id.* ¶¶ 66, 67, 70, 71.)

> **D.    Dougherty's Opt Out of the 2025 Take-Two Terms' Arbitration Agreement Was Invalid and, Even if Valid, She is Bound to the 2024 Take-Two Terms' Arbitration Agreement**

Plaintiff Dougherty sent an opt-out notice to Zynga, dated June 17, 2025 – more than 30 days after she validly accepted the 2025 Take-Two Terms on April 21, 2025.  (Ungberg Decl. ¶ 59.)  An opt-out notice is invalid if it is untimely under the agreement.  *See Akhter v. Compass Grp. USA, Inc.,* No. 22-CV-2194 (JMF), 2022 WL 4638635, at *2 (S.D.N.Y. Sept. 30, 2022) (finding plaintiff was bound to an arbitration agreement where she failed to opt-out within the prescribed 30-day period set forth in the agreement); *Edwards v. CVS Health Corp.*, 714 F. Supp. 3d 239, 247 (S.D.N.Y. 2024) (concluding plaintiff was bound to an arbitration agreement where she failed to mail an "opt out" letter within 30 days of signing the agreement); *Pelligrino v. Morgan Stanley Smith Barney LLC*, No. 17-CV-7865 (RA), 2018 WL 2452768, at *3 (S.D.N.Y. May 31, 2018) (concluding if an employee did not opt-out, then the employee is bound to the arbitration agreement); *Marino v. CVS Health*, 698 F. Supp. 3d 689, 695 (S.D.N.Y. 2023) (finding plaintiff

---

[5] Both Camargo's and Garcia's opt-out notices were timely submitted within 30 days of their acceptances of the 2025 Terms on April 18, 2025, and April 17, 2025, respectively, as required. (*Id.* ¶¶ 67, 71.)

[6] The transferor court noted that Plaintiffs did not dispute they would be bound by the 2024 Take-Two Terms if their opt-outs were valid.  (ECF No. 56 at 7.)

was bound to arbitration agreement where she failed to opt-out within required 30-day period). According to those Terms, a user "must notify us in writing within 30 days of the date that you *first accept* this Agreement" for it to be effective. (Ungberg Decl. Ex. C § 17.5(3)) (emphasis added). Dougherty did not meet that deadline.

Dougherty first sent an opt-out notice to Zynga, dated April 17, 2025 – four days *before* she accepted the 2025 Terms. (FAC ¶ 176.) But a user cannot preemptively opt out of the 2025 Terms before accepting them. *See Haider v. Lyft*, No. 20-cv-2997 (AJN), 2022 WL 1500673, at *3 (S.D.N.Y. May 11, 2022) (holding preemptive opt out to be invalid). Accordingly, Dougherty's opt out on April 17, 2025, was invalid because it was too early, and her subsequent opt out on June 17, 2025, was too late. But even if Dougherty's opt-out notices were valid – they are not – Dougherty (like Camargo and Garcia) would be bound by the arbitration agreement in the 2024 Take-Two Terms to which she previously agreed. (Ungberg Decl. ¶ 59.)

## III.   PLAINTIFFS SHOULD BE COMPELLED TO ARBITRATE BEFORE JAMS

All Plaintiffs agreed to the arbitration agreements in the 2024 Take-Two Terms and Dougherty agreed to the 2025 Take-Two Terms by failing to timely opt out. Pursuant to those arbitration agreements, Plaintiffs must arbitrate their claims against Zynga as individual arbitrations before JAMS. The Court need only conclude that a valid arbitration agreement exists because the Terms contain a valid delegation clause, requiring the arbitrator to decide any issues of scope or arbitrability. Even so, Plaintiffs' claims are well within the broad scope of the arbitration agreements.

18

### A.    The Terms Contain Valid Arbitration Agreements

Both sets of Terms include a valid arbitration agreement that requires Plaintiffs to arbitrate their claims against Zynga.[7]  Courts regularly compel internet user plaintiffs to arbitration where the website or app terms they agreed to include a valid arbitration provision.  *See, e.g.*, *Hidalgo v. Amateur Athletic Union of United States, Inc.*, 468 F. Supp. 3d 646 (S.D.N.Y. 2020); *Feld,* 442 F. Supp. 3d at 825.; *Hamilton v. Uber Techs., Inc.*, No. 22-CV-6917 (PGG) (OTW), 2023 WL 5769500 (S.D.N.Y. Sept. 7, 2023).

Here, the Terms apply to Zynga as a wholly-owned subsidiary of Take-Two, which is stated in both versions of the Terms.  (Ungberg Decl. ¶¶ 21-22, 25, 27, 38.)  The arbitration provisions in the Terms are substantially similar.  (*Id.*)  In addition, a notice regarding the inclusion of an arbitration provision in the Terms appeared prominently at the beginning of both versions of the Take-Two Terms.  (*Id.* Ex. B at 1, Ex. C at 1.)  The arbitration provision in both Terms requires each Plaintiff to arbitrate individually before JAMS under the JAMS Streamlined Arbitration Rules.  (*Id.* Ex. B §§ 15.5(4)-15.5(6), Ex. C §§ 17.5(4)-17.5(6).)  Because Plaintiffs assented to either the 2024 or 2025 Take-Two Terms, they are bound by the arbitration clauses therein and should be compelled to individual arbitrations before JAMS.

### B.    The Terms Contain Valid Delegation Clauses

The Terms contain a valid delegation clause granting the arbitrator "exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement," which includes any assertion of unconscionability.

---

[7] The 2024 and 2025 Take-Two Terms are governed by New York law. (Ungberg Decl. Ex. B § 15.1, Ex. C § 17.1 ("This Agreement . . . shall be governed by, and construed under, the laws of the State of New York without regard to conflict of law rules.").)  To the extent Plaintiffs dispute this, as explained in Zynga's accompanying Memorandum of Law in Support of its Motion to Dismiss, choice of law principles likewise support application of New York law to the formation and enforceability of the Take-Two Terms.

19

(Ungberg Decl. Ex. B § 15.5(1), Ex. C § 17.5(1).)  "Parties may explicitly delegate gateway issues of arbitrability to the arbitrator."  *Marino*,698 F. Supp. 3d at 696-97. Such delegation clauses are enforced.  *Id.* at 696 (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019)); *Guerrero v. GoPuff*, No. 24 CIV. 6727 (JHR) (GS), 2025 WL 3539105, at \*10-\*12 (S.D.N.Y. Dec. 10, 2025) (holding that a "clear and unmistakable" delegation clause required the arbitrator to decide plaintiffs' enforceability challenges).

The delegation clauses in the Terms are not unconscionable.  The Terms provide sufficient notice of the inclusion of a delegation clause on the very first page (Ungberg Decl. Ex. B at 1, Ex. C at 1) and provide users with the opportunity to opt out.  *See Kelly-Starkebaum*, 2024 WL 5135799, at \*9 (noting surprise is diminished by bolded notification of arbitration provision at the beginning of an agreement and concluding terms were not an adhesion contract "because they allowed her to opt out of the arbitration agreement (including the delegation clause)"); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 730-33 (E.D.N.Y. 2017) (finding a delegation clause was neither procedurally nor substantively unconscionable because plaintiffs were able to opt out and were not subject to coercion or hidden terms).  Critically, there is no evidence to suggest that "allowing an arbitrator – as opposed to a court – to decide the question of arbitrability would be unconscionable."  *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 118 (2d Cir. 2025).  Because the Terms contain a delegation clause, the Court must defer questions of arbitrability to the arbitrator. *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288, 301 (2024).

Without waiver of Zynga's rights to have the arbitrator determine the scope of the arbitration clause, all of Plaintiffs' causes of action are plainly within the scope of the arbitration agreement.  The Terms define a "Dispute" that must be arbitrated as "any dispute, claim, or controversy arising from or related to the Services, including those related to the formation, breach,

termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement, or your rights under those agreements." (Ungberg Decl. Ex. B § 15.5(1), Ex. C § 17.5(1).) This broad language encompasses Plaintiffs' claims of violations of California's consumer protection laws, as well as their common law and VPPA claims. The language is likewise broad enough to encompass all claims that accrued before Plaintiffs agreed to the terms. *See Galli v. PricewaterhouseCoopers LLP*, No. 20 CIV. 01640 (LGS), 2020 WL 8768079, at *2 (S.D.N.Y. Aug. 12, 2020) (holding arbitration agreement that expressly encompassed claims that arose prior to agreement was valid). All these claims arise from Plaintiffs' use of the Games and the purported in-app purchases and videos they allegedly saw. Thus, all claims must be arbitrated.

### C.    The Terms' Arbitration Provisions Are Not Unconscionable

Because the Terms contain a valid delegation clause, any question of unconscionability of the arbitration agreement should be left to the arbitrator to decide. *Guerrero*, 2025 WL 3539105, at *12. But if this Court decides the issue, it must find that the arbitration provision is both procedurally and substantively unconscionable to be unenforceable. *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 253 (1st Dep't 1998); *Glover v. Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 449 (S.D.N.Y. 2022). Plaintiffs preemptively allege that the New Era Mass Arbitration Procedure is generally "unconscionable" under the Ninth Circuit's ruling in *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024). (FAC ¶ 147.) Plaintiffs misinterpret *Heckman* and the parties' arbitration agreement.[8]

In *Heckman*, the Ninth Circuit concluded that Ticketmaster's arbitration agreement (which required both individual and mass arbitration administered by New Era) and its delegation clause were unconscionable. Ticketmaster's arbitration agreement itself contained numerous

---

[8] By making this argument, again, Zynga does not waive its rights to have the arbitrator determine the unconscionability of the arbitration agreement pursuant to the Terms' valid delegation clause.

terms that made them procedurally unconscionable, such as subjecting mere visitors to the Ticketmaster website to its terms of service. *Heckman*, 120 F.4th at 682. Ticketmaster's terms also stated that it may make changes to them at any time without notice, and that the new terms would become effective as soon as they are posted online. *Id.* The terms were also found to be affirmatively misleading in that they contradicted New Era's Rules in effect at the time. *Id.* at 683. The court also found that elements of New Era's Rules in effect when plaintiffs filed their mass arbitration contributed to finding substantive unconscionability, such as the application of bellwether precedent to all individuals in a mass arbitration, the lack of discovery, limited right of appeal, and the procedure for arbitrator selection. *Id.* at 683-87.

The Second Circuit and no court in this District has ruled on let alone adopted the Ninth Circuit's rulings on the New Era Mass Arbitration Procedures articulated in *Heckman*. Even so, Plaintiffs make no allegations that the Terms share any of the same procedural or substantive infirmities with Ticketmaster's terms at issue in *Heckman*. In fact, the Terms are distinguishable both procedurally and substantively.

Procedurally, notice of the Terms was provided by clear and conspicuous pop-ups that specifically advised, with hyperlinks to the Terms, that the Terms had changed and by clicking "Accept," a user was bound to them. (Ungberg Decl. ¶¶ 29, 40.) Both sets of Terms state clearly the arbitrator or arbitration entity that will handle disputes. (Ungberg Decl. Ex. B § 15.5(6) (stating when a dispute is arbitrated before a mass arbitration panel at New Era versus an individual arbitrator at JAMS), Ex. C § 17.5(6) (assigns JAMS to handle both individual and mass arbitrations).) This statement eliminates any ambiguity as to which arbitrator would decide Plaintiffs' dispute. *See Sweeney v. Tractor Supply Co.*, 390 F. Supp. 3d 1152, 1160 (N.D. Cal. 2019) (finding no unconscionability where agreement applied two different third-party arbitration

22

rules in different circumstances as articulated in the agreement).  Further, the batching procedure in the 2024 Take-Two Terms is laid out in detail in the arbitration provision and applies only to mass arbitrations.  (Ungberg Decl. Ex. B § 15.5(9).)

Substantively, the 2024 Take-Two Terms' arbitration provision applies the New Era Rules "in effect when the Mass Arbitration Disputes are filed."  (Ungberg Decl. Ex. B § 15.5(9).)  Since *Heckman*, New Era has significantly amended the substance of its mass arbitration procedures to remove any unconscionable rules.  *See* New Era ADR Procedures (Jan. 1, 2026).  Changes include:  (1) clarifying that parties always have the right to discovery; (2) clarifying a party's ability to opt out of mass arbitration procedures; (3) requiring written decisions and no additional charges for detailed "reasoned" opinions in mass arbitration; (4) removing binding effect of bellwether decisions and making them accessible to all mass arbitration claimants; and (5) updating the fee schedule, including so that a business must make up the difference between a consumer's share of the filing fee and the cost of filing a similar claim in court.  *Id.*

These changes are important because the 2024 Take-Two Terms do not invoke the same New Era Mass Arbitration Procedure that was analyzed in *Heckman*.  By applying the most recent, updated version of those rules, the 2024 Take-Two Terms do not apply any of the unconscionable rules rejected by the Ninth Circuit.  Accordingly, *Heckman* is limited to the specific facts of that case, which subsequent events have superseded.  Even if any aspect of the arbitration provisions is unconscionable (they are not), all users can opt out of the provision – which Camargo and Garcia did, and Dougherty attempted to do, as to the 2025 Take-Two Terms – thus eliminating any potential unconscionability.

**D.    Each Plaintiff Must Arbitrate Their Claims on an Individual Basis**

The arbitration agreements in the Terms include a class action waiver that prohibits Plaintiffs from arbitrating their claims on a class-wide basis.  The Supreme Court has held that "a party may not be compelled . . . to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so."  *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010); *see also Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 509 (2018) (enforcing class action waiver because "courts may not allow a contract defense to reshape traditional individualized arbitration by mandating class wide arbitration procedures without the parties' consent").  Because Plaintiffs agreed to and are bound by either the 2024 or 2025 Take-Two Terms and did not opt out of at least one of the Terms' arbitration agreements, the class action waiver prohibits them from litigating their claims as a class action in any forum.  Thus, each Plaintiff is required to arbitrate their claims on an individual basis before JAMS, under both sets of Terms.  (Ungberg Decl. ¶¶ 33, 41, 48.)

This Court need not decide how a hypothetical mass arbitration would proceed. Rather, this Court need only determine whether an arbitration agreement exists, which Zynga has established as to all three Plaintiffs.  If a mass arbitration[9] were to be brought after Plaintiffs are compelled to arbitrate, Plaintiffs would be required under either the Terms to abide by the agreed-upon mass arbitration procedures in the applicable Terms.[10]

---

[9] Under the 2024 Take-Two Terms, a "mass arbitration" is defined as "5 or more Disputes relating to the same or similar subject matter, which share common issues of law or fact, or in which the counsel or other organization representing the parties in such Disputes are the same, cooperating, or working in coordination."  (Ungberg Decl. Ex. B § 15.5(9).)  The 2025 Take-Two Terms define "mass arbitration" as 25 or more Disputes relating to the same or similar subject matter that share common issues of law or fact and in which the non-Take-Two parties or their legal representative are the same or acting in coordination."  (*Id.* Ex. C § 17.5(6).)

[10] For Camargo and Garcia, who are bound by the 2024 Take-Two Terms, a mass arbitration must be filed with New Era and conducted under their Mass Arbitration Procedures in effect at the time of filing.  (Ungberg Decl. ¶¶ 66, 67, 70, 71.)  For Dougherty, given that her opt out of the 2025

Indeed, when Plaintiffs' counsel previously filed hundreds of arbitration claims, JAMS referred the claims to a JAMS MAP Process Administrator. (Kratenstein Decl. ¶¶ 11-12, 18.) Plaintiffs' counsel then declined to abide by JAMS' decision, abandoned arbitration, and filed this lawsuit. (*Id.* ¶ 19.) Given that no mass arbitration is currently pending, any determination as to what would happen if Plaintiffs were to file another mass arbitration (having voluntarily withdrawn their previous one) would be advisory. *See Corsello v. Verizon N.Y., Inc.*, 976 F. Supp. 2d 354, 357 (E.D.N.Y. 2013) (rejecting request for advisory opinion). Thus, all three Plaintiffs should be compelled to arbitrate their disputes on an individual basis before JAMS.

## CONCLUSION

For the foregoing reasons, Plaintiffs should be compelled to arbitrate their claims individually before JAMS.

Dated:  New York, New York  
      April 24, 2026

MCDERMOTT WILL & SCHULTE LLP

*/s/ Andrew B. Kratenstein*

Andrew B. Kratenstein  
Chris Combs  
1 Vanderbilt Avenue  
New York, NY 10017  
Telephone: (212) 547-5400

David Saunders (*pro hac vice* forthcoming)  
Emilie E. O'Toole (*pro hac vice* forthcoming)  
MCDERMOTT WILL & SCHULTE LLP  
444 West Lake Street  
Suite 4000  
Chicago, IL 60606  
Telephone: (312) 372-2000

*Counsel for Defendant Zynga, Inc.*

---

Take-Two Terms was invalid, she would have to participate in any mass arbitration before JAMS under the JAMS MAP. (*Id.* ¶ 62.)