**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DOUGHERTY *et al.*,

Plaintiffs,

v.

ZYNGA, INC.,

Defendant.

Case No. 1:26-cv-02772-PAE

**DECLARATION OF ANDREW J. UNGBERG IN SUPPORT OF DEFENDANT ZYNGA, INC.'S MOTIONS TO COMPEL ARBITRATION AND TO DISMISS**

I, ANDREW J. UNGBERG, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am Vice President & Managing Counsel at Take-Two Interactive Software, Inc. ("Take-Two"). I am over the age of twenty-one (21), of sound mind, and capable of making this declaration.

2. I have been employed by Take-Two since April 2020. From April 2020 to May 2024, I was Senior Director and Counsel. From June 2024 to June 2025, I was Senior Director and Managing Counsel. I have been in my current role since June 2025.

3. In my roles at Take-Two, I have overseen the drafting of Take-Two's Terms of Service (the "Terms") for Take-Two's companies, subsidiaries, and labels, including Defendant Zynga, Inc. ("Zynga"). As a result, I have had to familiarize myself with the Terms and acceptance procedures discussed herein.

4. I am qualified and authorized in making this declaration based on my personal knowledge, the books and records of the companies, and information reported to me in the ordinary course of business by individuals with a business duty to accurately report that information. If called as a witness, I could and would competently testify to the matters stated herein.

**The Games**

5. Peak Games ("Peak") is based in Istanbul, Turkey. Peak created and released *Toy Blast* and *Toon Blast* (the "Games" and each, a "Game") in 2015 and 2017, respectively. As discussed further below, Zynga acquired Peak in July 2020 and Take-Two acquired Zynga in May 2022.

6. Played primarily on mobile devices, including iPhones and Android devices, the Games are free-to-play puzzle games in which players progress through each level by "blasting" adjacent matching tiles off the board over a set number of turns:

**Toy Blast**




**Toon Blast**




7. Each level has a designated goal requiring players to clear the puzzle board of a certain number and type of item over a set number of moves. Players start with a certain number of lives and lose lives when they fail to complete levels. Although players are provided with more lives periodically, players may run out of lives if they fail multiple times in a short time frame.

8. To aid their progress, both Games have an in-Game shop (the "Shop") where players purchase Coins. The Coins can be used to purchase additional lives, more moves to complete a level, or special items ("Boosters"), such as cartoon bombs or rockets that players can use to blast through entire rows and columns or other obstacles. In addition to Coins, players can also purchase packs that include various combinations of Coins, Boosters, and other bonuses, such as unlimited lives for a set period ("Bundles"). Bundles are sometimes offered to players at a discounted or sale price.










9. Each Bundle displayed in the Shop shows the Bundle's price, any percentage-off sale that is applied to that Bundle, and the time period for which the sale price will be available, if any.

10. The Shop also presents the complete contents of each Bundle to players before a purchase is made, including the specific number of Coins, the specific type and number of

Boosters, and the duration or effect of any other bonuses (e.g., the exact time period of any unlimited lives).

11. Both Games also present limited, one-time "First Purchase" offers for new players. For example, in Toon Blast, players making the first purchase through a First Purchase offer receive more Coins than they would in a standard purchase of the same or a similar Bundle.

**Toy Blast Shop**




**Toon Blast Shop**




12. The Shop is not the only way for players to obtain extra lives and other bonuses. Players can earn bonuses through gameplay, including, for example, playing each day, reaching specific in-Game milestones, or completing in-Game challenges, which regularly change.

13. The Games also have an active social component. Players can play with friends, join teams, and compete in tournaments, in which players can often earn additional rewards and share additional lives and bonuses with friends and teammates.

14. Players can play regularly and progress through the Games without ever making an in-Game purchase.

**Terms of Service Acceptance**

15. Since 2018, the Games have published notices requiring all players to agree to the operative Terms (the "Notices") to play the Games and make in-Game purchases. A player cannot continue into either Game without accepting a Notice.

16. The Games each use "clickwrap" Terms. A player who wishes to review the applicable Terms can click a link to review the current Terms on the Games' website, before clicking "ACCEPT" on the pop-up and continuing into the Game:







17. These Notices have been presented in substantially the same form as those shown above since their inclusion in the Games in 2018. A clear pop-up in the center of each Game's

introductory screen includes highlighted links to the operative Terms and the operative Privacy Policy.

18. Players may review the Terms and Privacy Policy by clicking these links, which open the full text in a browser window on their mobile device. Players cannot continue into the Game without selecting "ACCEPT." The most recent Terms are also always accessible through both the Peak website and the Take-Two website (https://www.take2games.com/legal/en-US/).

19. As shown in the right-hand example above, when the Terms are updated, players are prompted with a similar Notice and must select "ACCEPT" to continue into the Games.

## Terms History

### The Peak Terms

20. As discussed above, Peak required players to accept the operative Terms of Service to play the Games starting in June 2018 (the "Peak Terms"). A player who wished to review the Peak Terms could click a link that redirected him or her to the Peak Terms on the Games' website, before clicking "ACCEPT" on the pop-up and continuing into the Game. This pop-up continued to be used until it was replaced in 2024 by a similar pop-up Notice, which is discussed below.







21. After Peak was acquired by Zynga in July 2020, the Games continued using the Peak Terms that were in effect in 2018. A true and complete copy of those Peak Terms is attached hereto as Exhibit A.

22. The Peak Terms are governed by Turkish law and state that any claims must be brought in Turkish courts. (Ex. A § 12.) The Peak Terms also contain a class action waiver, which states, "By agreeing to these Terms of Services, you understand and agree that you waive the right to a class action and can only bring claims against Peak Games in your individual capacity." (*Id.* § 13.)

23. The Peak Terms also contain a severability clause, which states, "If any portion of [the Peak Terms] is found illegal or unenforceable, in whole or in part by any court of competent

jurisdiction, such provision shall, as to such jurisdiction, be ineffective solely to the extent of such determination of invalidity or unenforceability without affecting the validity or enforceability thereof in any other manner or jurisdiction and without affecting the remaining provisions of the terms, which shall continue to be in full force and effect." (*Id.* § 14.)

**The 2024 Take-Two Terms**

24. In May 2022, Zynga was acquired by Take-Two. Headquartered in New York, NY, Take-Two is an industry-leading developer, publisher, and marketer of video games that publishes products through a variety of labels, including Rockstar Games (*e.g.*, *Grand Theft Auto* and *Red Dead Redemption*), 2K (*e.g., NBA 2K25* and *Civilization VI*), and Zynga. Take-Two's games are available through gaming consoles such as PlayStation and Xbox, as well as PCs and mobile platforms, including the iPhone and Android devices.

25. After Take-Two acquired Zynga and until February 28, 2024, the Games continued to use the Peak Terms, and any new player was required to accept the Peak Terms to play the Games, including to make purchases therein.

26. I understand that Plaintiffs' counsel previously sought to arbitrate similar claims under the Take-Two's 2019 End User License Agreement (the "2019 EULA"). However, while the 2019 EULA was the operative terms of service for certain games owned by Take-Two, the 2019 EULA was never applied to the Games. Instead, the Games continued to require players to accept the Peak Terms from June 2018 to February 2024.

27. In January 2024, Take-Two began implementing the 2024 Take-Two Terms of Service (the "2024 Take-Two Terms") to streamline and make consistent the various terms of services utilized across Take-Two companies' games. A true and complete copy of the 2024 Take-Two Terms is attached hereto as Exhibit B.

28. On or around January 25, 2024, a pop-up notice informed the Games' players that the terms of service would soon be changing, and players would be required to accept those new terms to continue to play the Games. This pop-up notice allowed players to click a link and view the new Terms.







29. The 2024 Take-Two Terms were introduced in the Games on or around February 28, 2024. As with the Peak Terms, a "clickwrap" pop-up Notice provided notice of the 2024 Take-Two Terms and required players to select "ACCEPT" before continuing into the Games. This Notice appeared when a player first played the Game on or after February 28, 2024. A player who wished to review the 2024 Take-Two Terms could click a link in the pop-up that redirected him or her to the Terms of Service on the Games' website, before clicking "ACCEPT" on the pop-up and continuing into the Game.







30. The 2024 Take-Two Terms "cover the terms and conditions by which we offer you access to use our [Take-Two's] games, apps, products, websites, and other services (the 'Services') as well as Virtual Items . . . ." (Ex. B at 1.)

31. The 2024 Take-Two Terms are governed by New York law and require that any non-arbitrable claims be litigated in a federal or state court in New York County, New York. (Ex. B § 15.1.)

32. Like the Peak Terms, the 2024 Take-Two Terms contain a class action and jury trial waiver, as well as a severability provision. (Ex. B §§ 15.5(2), 15.5(12).)

33. For individual consumer disputes, the 2024 Take-Two Terms require individual arbitrations with JAMS ADR ("JAMS") under the JAMS Streamlined Arbitration Rules and Procedures. (Ex. B. § 15.5(6).)

34. For situations in which there are "5 or more Disputes relating to the same or similar subject matter, which share common issues of law or fact, or in which the counsel or other organization representing the parties in such Disputes are the same, cooperating, or working in coordination," the 2024 Take-Two Terms require arbitration with New Era ADR ("New Era") under the New Era Mass Arbitration Rules (the "New Era Rules"). (Ex. B. § 15.5(9).)

35. The 2024 Take-Two Terms require that arbitrations with New Era under the New Era Rules be "governed by the New Era Rules in effect when the Mass Arbitration Disputes are filed . . . ." (*Id.*)

36. Section 15.5(9) of the 2024 Take-Two Terms contains a separate severability provision, which states, "If . . . Section 15.5(9) is void or unenforceable . . . then the Arbitration Agreement shall be deemed null and void in its entirety and you and Take-Two shall be deemed not to have agreed to arbitrate such Disputes." (*Id.*)

37. The 2024 Take-Two Terms also contain an "Arbitrability Provision," which grants the arbitrator the exclusive authority to resolve any disputes, including concerning applicability, enforceability, or formation of the arbitration agreement:

> The arbitrator . . . shall have exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable. The arbitrator shall also have authority to determine all threshold arbitrability issues, including related to whether the Agreement or the Arbitration Agreement are unconscionable or illusory; whether the Arbitration Agreement has been disaffirmed under applicable law; and any defense to arbitration including waiver, delay, laches, or estoppel. The arbitrator may award the same remedies as a court could, but only to the extent required to satisfy the individual Dispute at issue.

(*Id.* § 15.5(1).)

**The 2025 Take-Two Terms**

38. On or around February 28, 2025, Take-Two began implementing new Terms of Service (the "2025 Take-Two Terms") across its full line of products, including the Games. A true and complete copy of the 2025 Take-Two Terms is attached hereto as Exhibit C.

39. The 2025 Take-Two Terms were introduced in the Games on or around March 28, 2025.

40. As with the Peak Terms and the 2024 Take-Two Terms, a "clickwrap" pop-up Notice provided notice of the 2025 Take-Two Terms and required players to select "ACCEPT" before continuing into Toon Blast or into Toy Blast. This Notice appeared when a player first played the Game on or after March 28, 2025. A player who wishes to review the 2025 Take-Two Terms can click a link to review the Terms of Service on the Games' website, before clicking "ACCEPT" on the pop-up and continuing into the Game.






41. The 2025 Take-Two Terms are similar to the 2024 Take-Two Terms in that the 2025 Take-Two Terms also: (i) "cover the terms and conditions under which we offer you access to use our [Take-Two's] games, apps, products, websites, and other services (the 'Services') as well as Virtual Items . . . "; (ii) are governed by New York law and require that any non-arbitrable claims be litigated in a federal or state court in New York County, New York; and (iii) contain an (a) arbitrability provision; (b) a severability provision; (c) a class action and jury trial waiver provision; and (d) require the JAMS Streamlined Rules for individual consumer disputes. (Ex. C at 1 and §§ 17.1,17.5.)

42. A difference between the 2024 and 2025 Take-Two terms is that, instead of the New Era Rules governing mass arbitrations, the 2025 Take-Two Terms state that the "JAMS Mass Arbitration Procedures" (the "JAMS MAP") govern "mass arbitration" disputes. (*Id.* § 17.5(6).) The 2025 Take-Two Terms define a "mass arbitration" as "25 or more Disputes relating to the same or similar subject matter that share common issues of law or fact and in which the non-Take-Two parties or their legal representative are the same or acting in coordination." (*Id.* § 17.5(6).) The 2025 Take-Two Terms apply the JAMS MAP in such situations.

43. The 2025 Take-Two Terms contain other substantive changes from the 2024 Take-Two Terms, including changes that further clarify what user content and conduct is acceptable in Take-Two's products and services (*id.* § 6) and updates to Take-Two's policies concerning moderating content created by users using Take-Two's products or services that may be in violation of the "User Rules," and users' appeal process (*id.* § 7).

**The Opt-Out Provisions**

44. Both the 2024 Take-Two Terms and the 2025 Take-Two Terms contain "Opt-Out" provisions. (Ex. B § 15.5(3), Ex. C § 17.5(3).) The Opt-Out provisions only apply to the Arbitration Agreement in the Terms of Service. The rest of the Terms of Service, including the choice-of-law provisions, apply regardless of whether a player opts out.

45. The 2024 Take-Two Terms' Arbitration Agreement states, "You have the right to opt out of this Arbitration Agreement. You must notify us in writing within 30 days of the date that you first accept this Agreement ('Opt-Out Notice') unless a longer period is required by applicable law." (Ex. B § 15.5(3).)

46. The 2024 Take-Two Terms require that "a clear, signed statement that you do not agree to the Arbitration Agreement" be sent to Take-Two by mail. (*Id.*)

47. The 2025 Take-Two Terms' Arbitration Agreement (§ 17.5) contains an Opt-Out provision nearly identical to the one in the 2024 Take-Two Terms – except that the Opt-Out Provision in the 2025 Take-Two Terms' Arbitration Agreement contains additional text which states, "For clarity, if you accepted a previous version of the Arbitration Agreement and did not Opt Out, your Opt-Out Notice will be limited to the materially updated terms of this version. In this case, You and Take-Two, will still arbitrate any Dispute under the terms of the Arbitration Agreement as of the date you first agreed to it or the effective date of the last version of the Arbitration Agreement. . . ." (Ex. C § 17.5(3).)

48. The Opt-Out Provision in the 2025 Take-Two Terms' Arbitration Agreement thus only applies to the parts of the Arbitration Agreement in the 2025 Take-Two Terms that were materially updated from the 2024 Take-Two Terms. As discussed above, the Arbitration Agreements in the 2024 Take-Two Terms and the 2025 Take-Two Terms are

largely the same. The difference is the arbitral forum and procedures for "mass arbitration disputes," with the 2024 Take-Two Terms using the New Era Rules for qualifying mass arbitration disputes and the 2025 Take-Two Terms using the JAMS MAP for qualifying mass arbitration disputes. Thus, Plaintiffs who opted out of the 2025 Take-Two Terms still must bring an individual arbitration under the JAMS Streamlined Rules, or (if qualifying) a mass arbitration under the New Era Rules.

**Players' User IDs**

49. When a player downloads either Game and accepts the operative Terms, they are assigned a unique user identification string of numbers and/or letters in the Game (the "User ID") for internal tracking purposes.

50. Because players are not required to (and cannot) create an account with a unique username or password, or link the account to an email address, the User ID is the primary way Take-Two can look up a player's actions in the Games, including their historical acceptances of the Terms of Service.

51. Starting with the 2025 Take-Two Terms, Take-Two began requiring that users of any of its games to provide their "user ID number," if applicable, in any Notice of Dispute or Opt-Out Notice.

52. In January 2025, Peak made changes to the Games' user interface so that User IDs are always visible at the bottom of the Settings page in each Game as shown in the red boxes below:




**Plaintiffs' Acceptances of the Terms of Service and Opt-Out Notices**

53. Beginning in April 2025, in connection with individual arbitrations filed against Take-Two, Plaintiffs' counsel began delivering purported opt-out notices (the "Opt-Out Notices") to Take-Two. On April 29, 2025, Take-Two received 624 Opt-Out Notices purporting to opt out of the Arbitration Agreement in the 2025 Take-Two Terms. The vast majority were dated April 4, 2025, and mailed on April 22, 2025. Most, but not all, of these Opt-Out Notices were for individuals who submitted claims in the JAMS Arbitration that was ongoing at that time.

54. The Opt-Out Notices received by Take-Two acknowledge that they apply only to the Arbitration Agreement contained in the 2025 Take-Two Terms, and each states, "By this letter,

I unequivocally opt out of, and do not agree to, the arbitration clause set forth in 'Dispute Resolution: Binding Individual Arbitration; Waiver of Class Actions and Jury Trials,' Section 17.5 of Take-Two Interactive Software, Inc.'s ('Take-Two') Terms of Service revised on February 28, 2025."

55. Over the past few years, Take-Two has also received hundreds of opt-outs from individual players not affiliated with this dispute.

**Dougherty**

56. Plaintiffs' counsel provided a signed Opt-Out Notice on behalf of Plaintiff Cheryll Dougherty ("Dougherty"), dated April 17, 2025, purporting to opt out of the 2025 Take-Two Terms. This Opt-Out Notice did not contain a User ID in either Toon Blast or Toy Blast. A true and complete copy of this Opt-Out Notice is attached hereto as Exhibit D.

57. Plaintiffs' counsel provided another signed Opt-Out Notice on behalf of Dougherty, dated June 17, 2025. A true and complete copy of this Opt-Out Notice (redacted for Dougherty's personal information) is attached hereto as Exhibit E.

58. The second Opt-Out Notice contained a User ID for Dougherty in Toon Blast. Plaintiffs have not provided a User ID for Dougherty in Toy Blast.

59. Using the Toon Blast User ID, Take-Two reviewed company records and confirmed that Dougherty downloaded Toon Blast on June 20, 2024, and accepted the 2024 Take-Two Terms at the same time via the in-Game pop-up.

60. On April 21, 2025, Dougherty also accepted the 2025 Take-Two Terms via the in-Game pop-up.

61. Dougherty's first Opt-Out Notice is dated April 17, 2025, before Dougherty accepted the Take-Two Terms on April 21, 2025.

62. Dougherty's second Opt-Out Notice is dated June 17, 2025, over thirty days after she last accepted the 2025 Take-Two Terms, and outside of the opt-out window provided in the 2025 Take-Two Terms. (Ex. C § 17.5(3).)

63. Dougherty did not opt out of the arbitration agreement in the 2024 Take-Two Terms.

**Camargo**

64. Plaintiffs' counsel provided a signed Opt-Out Notice on behalf of Plaintiff Delia Camargo ("Camargo"), dated April 25, 2025, purporting to opt out of the 2025 Take-Two Terms. A true and complete copy of this Opt-Out Notice (redacted for Camargo's personal information) is attached hereto as Exhibit F.

65. The Opt-Out Notice contained Camargo's User ID. Using this User ID, Take-Two reviewed company records and confirmed that Camargo was a player in Toy Blast. No User ID for a Toon Blast account was provided.

66. Camargo downloaded Toy Blast on July 18, 2016. She then accepted the Peak Terms on at least June 10, 2019, via an in-Game pop-up. On December 11, 2020, she downloaded Toy Blast on a different device and accepted the Peak Terms again that same day via an in-Game pop-up. She accepted the 2024 Take-Two Terms on April 23, 2024, via an in-Game pop-up, and accepted the 2025 Take-Two Terms on April 18, 2025, via an in-Game pop-up.

67. As discussed above, Camargo purportedly opted out of the 2025 Take-Two Terms' arbitration agreement on April 25, 2025. Camargo did not opt out of the arbitration agreement in the 2024 Take-Two Terms.

**Garcia**

68. Plaintiffs' counsel provided two signed Opt-Out Notices on behalf of Plaintiff Lawrence Garcia ("Garcia"), one dated April 15, 2025, and another dated April 25, 2025, purporting to opt out of the 2025 Take-Two Terms. True and complete copies of these Opt-Out Notices (redacted as to Garcia's personal information) are attached hereto as Exhibit G.

69. The Opt-Out Notice contained Garcia's User ID. Using this User ID, Take-Two reviewed company records and confirmed that Garcia played Toon Blast. No User ID linking Garcia to a Toy Blast account was provided.

70. Garcia downloaded Toon Blast on September 14, 2018. He accepted the Peak Terms on the same day via the in-Game pop-up. He accepted the 2024 Take-Two Terms on November 21, 2024, via the in-Game pop-up, and accepted the 2025 Take-Two Terms on April 17, 2025, via the in-Game pop-up.

71. As discussed above, Garcia purportedly opted out of the 2025 Take-Two Terms' arbitration provision on April 15 and 25, 2025. Garcia did not opt out of the arbitration agreement in the 2024 Take-Two Terms.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

April 23, 2026

Signed by:
Andrew Ungberg
CCDC1F2F2EE9406...
Andrew J. Ungberg