**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CHERYLL DOUGHERTY, DELIA CAMARGO, and LAWRENCE GARCIA on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZYNGA, INC.,<br><br>Defendant. | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Case No. 1:26-cv-02772-PAE |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND................................................................................. 2

        A.      Defendant engages in widespread deceptive marketing. ........................ 2

        B.      Defendant fosters addiction and uses psychologically manipulative
                dark patterns......................................................................................... 3

        C.      Defendant violates the VPPA for hundreds of millions in profit............ 5

        D.      Plaintiffs fall prey to Defendant's unlawful tactics. ............................. 6

III.    LEGAL STANDARDS ........................................................................................ 8

IV.     ARGUMENT....................................................................................................... 8

        A.      California law applies to Plaintiffs' claims............................................ 8

        B.      Plaintiffs adequately state their California claims. .............................. 12

                1.      Plaintiffs easily satisfy rule 9(b)................................................ 12

                2.      The CLRA covers Defendant's conduct here............................. 15

                3.      Plaintiffs adequately allege addictiveness as a component of
                        their claims. .............................................................................. 17

                4.      Plaintiffs have standing to seek injunctive relief under California
                        law. ........................................................................................... 19

        C.      Plaintiffs have been injured under New York law................................ 20

        D.      Plaintiffs state claims under the VPPA............................................... 22

V.      CONCLUSION.................................................................................................. 25

i

**TABLE OF AUTHORITIES**

**Cases**

*Afriyie v. NBCUniversal Media, LLC,*
775 F. Supp. 3d 791 (S.D.N.Y. 2025) ................................................................... 25

*Ariix, LLC v. NutriSearch Corp.,*
985 F.3d 1107 (9th Cir. 2021) ............................................................................ 19

*Binder v. Michael Kors (USA), Inc.,*
2024 WL 3227943 (S.D.N.Y. June 28, 2024) ........................................... 13, 14, 15

*Burdette v. FuboTV Inc.,*
2024 WL 2831466 (N.D. Ill. June 4, 2024) ......................................................... 24

*C.W. v. Epic Games, Inc.,*
2020 WL 5257572 (N.D. Cal. Sept. 3, 2020) ...................................................... 16

*Cambridge Cap. LLC v. Ruby Has LLC,*
675 F. Supp. 3d 363 (S.D.N.Y. 2023) ............................................................ 10, 11

*Campos v. Tubi, Inc.,*
716 F. Supp. 3d 623 (N.D. Ill. 2024) .................................................................. 24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
447 U.S. 557 (1980) ........................................................................................... 19

*Courtright v. Epic Games, Inc.,*
795 F. Supp. 3d 1156 (W.D. Mo. 2025) .............................................................. 19

*Dahlin v. Under Armour, Inc.,*
2020 WL 6647733 (C.D. Cal. July 31, 2020) ...................................................... 13

*DarkPulse, Inc. v. Crown Bridge Partners, LLC,*
2026 WL 696787 (S.D.N.Y. Mar. 12, 2026) ....................................................... 10

*Davis v. Angelcare USA, LLC,*
727 F. Supp. 3d 99 (D. Conn. 2024) ................................................................... 12

*Doe 1 v. AOL LLC,*
552 F.3d 1077 (9th Cir. 2009) ......................................................................... 9, 12

*Doe v. Epic Games, Inc.,*
435 F. Supp. 3d 1024 (N.D. Cal. 2020) .............................................................. 16

*Doe v. Roblox Corp.,*
602 F. Supp. 3d 1243 (N.D. Cal. 2022) ........................................................... 15, 17

*Fin. One Pub. Co. v. Lehman Bros. Special Fin.*,
  414 F.3d 325 (2d Cir. 2005) ...................................................................................... 9

*Fleetwood Servs, LLC v. Ram Capital Funding, LLC,*
  2022 WL 1997207 (S.D.N.Y. June 6, 2022) ....................................................... 8, 11

*Gill v. Nat'l Football League*,
  2021 WL 5087900 (S.D.N.Y. Nov. 2, 2021)........................................................ 8, 25

*Guerriero v. BB OPCO, LLC,*
  2026 WL 878716, (S.D.N.Y. Mar. 30, 2026) ............................................. 13, 14, 22

*Henry v. Major League Baseball Advanced Media*, *L.P.*,
  2025 WL 3717068 (S.D.N.Y. Dec. 23, 2025) ......................................................... 11

*Heskiaoff v. Sling Media, Inc.*,
  719 F. App'x 28 (2d Cir. 2017) ............................................................................. 8, 9

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ................................................................................ 15

*Khan v. Coinbase, Inc.*,
  2025 WL 2985378 (Cal. Ct. App. Oct. 23, 2025)..................................................... 20

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012) ..................................................................................... 9

*Mai v. Supercell Oy*,
  2024 WL 2077500 (9th Cir. May 9, 2024).............................................................. 15

*Mai v. Supercell Oy*,
  648 F. Supp. 3d 1130 (N.D. Cal. 2023) .................................................................. 16

*Medtronic, Inc. v. Walland*,
  2021 WL 4131657 (S.D.N.Y. Sept. 10, 2021)......................................................... 12

*Moore v. Kayport Package Exp., Inc.,*
  885 F.2d 531 (9th Cir. 1989) .................................................................................. 13

*Morrow v. Ann Inc.*,
  2017 WL 363001 (S.D.N.Y. Jan. 24, 2017) ............................................................ 14

*Ochoa v. Zeroo Gravity Games LLC*,
  2023 WL 4291650 (C.D. Cal. May 24, 2023) ......................................................... 17

*Salazar v. Nat'l Basketball Ass'n*,
  118 F.4th 533 (2d Cir. 2024) .................................................................................. 25

*Small v. Lorillard Tobacco Co.*,
  94 N.Y.2d 43 (1999) ................................................................................................ 21

*Solomon v. Flipps Media, Inc.*,
  136 F.4th 41 (2d Cir. 2025) ...................................................................................... 23

*Stevens & Co. LLC v. Espat*,
  2025 WL 950989 (S.D.N.Y. Mar. 28, 2025) ........................................................... 11

*Sutton v. TED Found., Inc.*,
  2026 WL 207000 (S.D.N.Y. Jan. 27, 2026) ............................................................ 24

*Tesla Wall Sys., LLC v. Related Companies, L.P.*,
  2018 WL 4360777 (S.D.N.Y. Aug. 15, 2018) ......................................................... 12

*U.S. v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .................................................................................. 13

*Van Mourik v. Big Heart Pet Brands, Inc.*,
  2018 WL 1116715 (N.D. Cal. Mar. 1, 2018)............................................................ 12

*Vizcarra v. Michaels Stores, Inc.*,
  F. Supp. 3d, 2024 WL 64747 (N.D. Cal. Jan. 5, 2024) ........................................... 13

**Statutes**

18 U.S.C. § 2710.......................................................................................................... 25

Cal. Civ. Code § 1776.................................................................................................. 15

Cal. Civ. Code § 770.................................................................................................... 15

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................... 12

## I.    INTRODUCTION

The case involves rampant consumer fraud in Defendant Zynga's mobile games Toon Blast and Toy Blast (the "Games"). Through its patented technology, Defendant has fine-tuned its deceptive tactics to get individuals like Plaintiffs to spend exorbitant sums. Defendant makes $1 million a day from these supposedly "free to play" Games, which have likely netted more than $1 billion in total profit for Defendant. *See* ¶ 8.[1]  At its core, Defendant's strategy is analogous to paradigmatic false advertising tricks adopted from brick-and-mortar stores to the in-app purchase context. Just like a person going to a mall or a department store to buy jeans and seeing advertisements of "LIMITED TIME SALE," or "40% OFF," a player of the Games will be bombarded with in-app offers claiming significant discounts and limited time sales or bonuses. But the discounts are entirely fictitious, and the fake sales never end. Courts have repeatedly rejected arguments that a defendant is immune from liability simply because it deploys these predatory tactics in a digital forum. Here, Defendant's conduct is even worse than a run-of-the-mill false discounting scheme: Defendant uses what the FTC refers to as "dark patterns," *i.e.* deceptive features that manipulate and pressure users into unwanted actions. Defendant also designs the Games to be addictive, then leverages that addiction to make users more susceptible to its false-discounting scheme. That is how Games marketed as "free to play" generate more than $1 million a day in revenues for Defendant.

Plaintiffs adequately allege each of the core elements of their various consumer protection claims: Defendant made a variety of materially false and misleading statements; as Defendant intended, Plaintiffs relied on those statements in making in-app purchases they would not otherwise have made; and Plaintiffs were injured when Defendant took their money under false

---

[1] Unless otherwise noted, paragraph symbols refer to those in the Amended Complaint, Dkt. 33.

1

premises and caused them to lose money they would not have spent otherwise.

Defendant has also made a fortune violating the Video Privacy Protection Act ("VPPA") and monetizing its users' personal information and video viewing histories. Zynga incentivizes players of the Games to watch pre-recorded video advertisements, which provide a separate revenue stream from in-app purchases and are a significant source of revenue for Zynga. ¶ 91. For instance, when users run out of moves to beat a level, they can watch video advertisements to get additional moves. ¶ 92. Zynga estimates that 85% of Zynga gamers have been shown these videos, and it made $302.5 million in mobile game advertising revenue in 2020 alone. ¶ 93, 95. Defendant practically admits to violating the VPPA. In addition to statements in privacy policies, user settings, annual reports, and in promotional materials to its third party marketers, Zynga explicitly advises users in Toy Blast: "we may share your personal and in-game video viewing information with [ ] third parties"; and in Toon Blast, "we may share your personal and in-game video viewing information with [ ] third parties." ¶¶ 118–19.  The motion to dismiss should therefore be denied.

## II.    FACTUAL BACKGROUND

Defendant's Games are functionally identical "tile matching" games, similar to Candy Crush. ¶ 30. Users select groups of matching tiles in an attempt to clear the board before they run out of "moves" and lose a "life." ¶¶ 30–32. Each Game has its own branding, but the gameplay and user experience take the same shape. ¶ 33. And most importantly, Defendant employs identical deceptive business practices in both Games. ¶ 33.

## A.    Defendant engages in widespread deceptive marketing.

The Games use a series of false and deceptive advertising tricks to artificially inflate the perceived worth of the bundle of items that players purchase. ¶ 39. Players are bombarded with offers of limited time discounts or special sales. ¶ 40. But the "discount" or "sale" price is false—the advertised products are always purportedly on sale or sold on discount—so there is no real sale

or discount at all. ¶¶ 41, 44, 45, 46, 48. As part of this deception, the Games use false reference pricing, with claims often ranging from 60% to 90% "off" a non-existent regular price. ¶ 46. This creates the illusion that the packs are worth more than the offered "sale" price. *Id*. Offers also frequently display countdown timers, creating the illusion of scarcity and of a limited-time offer in order to pressure players into making purchases. ¶ 47.

**B.      Defendant fosters addiction and uses psychologically manipulative dark patterns.**

Defendant manipulates users in other ways to make them especially vulnerable to its deceptive advertising. The Games use a number of "dark pattern" psychological tactics to foster addiction and drive compulsive spending. ¶ 4.[2] The Games are designed to be addictive, constantly stimulating the brain's reward centers in the same manner as slot machines, including by providing "auditory and visual rewards for winning moves," offering "incremental rewards that reinforce 'correct' behavior," and creating "an illusion of control." ¶ 70. Defendant then implements another layer of addictive game design by offering microtransactions, *i.e.* items for sale at small amounts but at high velocity and frequent intervals, so that Defendant can take advantage of and foster addictive tendencies with respect to the transactions themselves. ¶ 71. These increase the likelihood of problematic microtransaction purchase behavior and addictive behaviors. ¶ 71.

Once addicted, players of the Games find that successive levels become increasingly difficult to complete without the purchase and use of in-game items. ¶ 56. As noted by a Reddit user (and experienced Toon Blast player): "it should be possible to beat [a level] without the use of boosters, ads, coins, etc. But some levels are, for practical purposes, not beatable without these

---

[2] "Dark patterns" are manipulative design practices that cause users to take unwanted actions, such as those identified by the Federal Trade Commission ("FTC") in its September Sept. 14, 2022 report "Bringing Dark Patterns to Light," available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14 .2022%20-%20FINAL.pdf.

add-ons." *Id.* As each level becomes increasingly more difficult, and users are unable to complete a level, the Games pressure players into buying extra moves. ¶ 59. For example, the Games cause players to fear the loss of their winning streaks or competitions (and promised rewards) if they decide not to make the purchase. ¶ 59.

Defendant has even patented various technologies it has invented to keep individuals hooked on the Games and spending money. ¶¶ 78–85. It develops models to predict which users are likely to spend money, how much money they are likely to spend, and what type of false or misleading advertising will maximize revenue. ¶ 78. For instance, Defendant's patented "prediction model generator" "generates a model to predict the likelihood of a player making a purchase or payment in the game" and then pairs it with a recommendation model to trick players into spending more. ¶ 78. For "likely buyers," Defendant's model recommends that "in-game personalization may be used to aggressively target revenue features (*e.g.* flash sales, etc.)" and suggests "showing a discount offer to Likely Buyers 2x more often as compared to that shown for Non Likely Buyers." *Id.*

Defendant also deploys a bespoke pattern of fake discounts to sell items at a price and discount percentage custom tailored to each user. ¶ 82. As Defendant's patent, "Customized offers for sales of combinations of virtual items," explains, Zynga has developed a model to choose the discounts and sales that it believes will appeal best to each user. ¶ 82. Zynga openly admits the presentation is deceptive: "The presenting suggests that the combination of virtual items is randomly selected from a set of virtual items or that the discounted price is randomly selected from a set of discounted prices. However, in actuality, the combination of virtual items or the discounted price may not be selected randomly." ¶ 83. Rather, games using this technology create bogus discounts specifically tailored to appeal to individual players to induce them to make purchases.

4

¶ 84. Specifically, Defendant employs an "offer-generation module" that uses a variety of data points about an individual user to present a custom-made fictional "sale" that is most likely to cause the player to make a purchase. The fake sale is created using "the combinations of virtual items and discount percentages that are most likely to increase revenues received by an operator of the game networking system," in order to "maximize[] the revenues received," *i.e.* to extract the most money from the targeted player. ¶ 85.

## C.    Defendant violates the VPPA for hundreds of millions in profit.

Zynga also incentivizes players of the Games to watch pre-recorded video advertisements, which generates significant revenue. ¶ 91. For instance, when users run out of moves to beat a level, they can watch video advertisements to get additional moves. ¶ 92. Zynga estimates that 85% of Zynga gamers have been shown these videos, allowing it to make $302.5 million in mobile game advertising revenue in 2020. ¶¶ 93, 95. In its 2020 Annual Report, Zynga explains how it leverages the expansive data it captures from its players to monetize its games, including through advertising:

> At the core of Zynga's live services platform is our first-party data network, which captures key insights about how our players are interacting with our games. We use this data to deliver highly engaging interactive experiences for our players, optimize our user acquisition and determine how to best monetize our games, including advertising.

To this day, video advertising remains central to Zynga's strategy to profit from its mobile applications, including the Games. ¶ 100. It maintains an entire website dedicated to promoting advertising to third parties, https://www.zyngaads.com/. *Id.*

Zynga has also bragged how its "[t]argeting capabilities in mobile games are extensive," explaining that Zynga "think[s] about targeting data in three buckets: demographics, interest and purchase intent. . . . Whether it's first-party, second-party, third-party data or contextual, you will

5

have to use all of them to maximize reach." ¶ 110. Zynga's Privacy Policy reveals how it performs this "targeting," and admits that Zynga shares a wide range of PII and a user's game activity with third parties. ¶ 111. For instance, Zynga collects:

> **Identifiers / Contact Information**: Name, user name, gamertag, postal and email address, phone number, unique IDs, mobile device ID, platform ID, gaming service ID, advertising ID (IDFA, Android ID) and IP address . . .
>
> **Internet / Electronic Activity**: Web / app browsing and gameplay information related to the Services; information about your online interaction(s) with the Services or our advertising; and details about the games and platforms you use and other information related to installed applications . . .
>
> **Device and Usage Data** "device type, software and hardware details, language settings, browser type and version, operating system, and information about how users use and interact with the Services (e.g., content viewed, pages visited, clicks, scrolls)." ¶ 112.

Zynga even admits it creates a "personalized profile" of its users:

> **Profile Inferences**: Inferences made from your information and web activity to help create a personalized profile so we can identify goods and services that may be of interest. ¶ 113.

Finally, Zynga admits that "we share your information with . . . advertising service providers and third-party advertising partners," and that it "has sold and/or shared unique identifiers, IP address, as well as Internet/Electronic Activity and Profile Inferences with third-party advertising providers to enable us to provide personalized advertising . . . ." ¶¶ 114–115.

Separate from the Privacy Policy, Zynga even recently directly admitted to Toon Blast and Toy Blast players that it shares their PII and video viewing history, consistent with the above statements. ¶ 118 (Toon Blast Pop-up stating that Zynga "share[s] your personal and video viewing information with" third parties), ¶ 119 (similar disclosure for Toy Blast).

**D.    Plaintiffs fall prey to Defendant's unlawful tactics.**

Plaintiff Cheryll Dougherty is a California resident who currently plays the Toon Blast

game and previously played the Toy Blast game. ¶ 12. When she played Toy Blast, Plaintiff Dougherty frequently made in-app purchases of the various types of packs and sale items because of Defendant's deceptive advertising and illegal marketing tactics. ¶ 12 & App'x A.

Plaintiff Delia Camargo is also a California resident who plays the Toon Blast game, so much so that she felt addicted and compelled to play Toon Blast, even losing sleep playing it. For over 8 years, including until about a year ago, she estimates spending upwards of two to three hours each day playing the game, every day of the week. In Toon Blast, Plaintiff estimates spending over $1,000 spread across frequent in-app purchases, which included purchases of the various types of packs and sale items described in the amended complaint, such as packs that were advertised as being on sale or purporting to advertise massive discounts. ¶ 13.

Plaintiff Lawrence Garcia was a California resident until August 2024. ¶ 14. Like the other Plaintiffs, Garcia found the app addictive and spent hundreds of dollars across frequent in-app purchases on packs purporting to offer massive discounts. ¶ 14. He also watched pre-recorded video content in the Toon Blast game. ¶ 15.

Because of Defendant's false and misleading advertising and sales tactics, and intentionally addicting game design, all Plaintiffs made in-app purchases in the Games at higher prices and at higher frequencies than they otherwise would have. ¶ 16. These in-app purchases included items or packs that were falsely advertised as on limited-time sales or discounted. ¶ 16. And because of Defendant's unlawful tactics, designed to pressure Plaintiffs into making a rapid series of small purchases, Plaintiffs cannot recall the specific details of every false advertisement or purchase, although each Plaintiff recalls purchasing packs based on the deceptive advertising described above and in the amended complaint. ¶ 16.

When players, including Plaintiffs Dougherty and Garcia, watched video advertisements

in the Games, their PII and video viewing history were shared with third parties, including Zynga's advertising partners, so that Zynga could profit from selling targeted advertising. ¶¶ 88–122.

### III.     LEGAL STANDARDS

In resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Gill v. Nat'l Football League*, 2021 WL 5087900, at *3 (S.D.N.Y. Nov. 2, 2021) (Engelmayer, J.).

### IV.     ARGUMENT

#### A.  California law applies to Plaintiffs' claims.

The Terms' choice of law clauses, by their own terms, do not apply to Plaintiffs' non-contractual claims. Both Terms provide: "This Agreement is entered into in the State of New York and shall be governed by, and construed under, the laws of the State of New York without regard to conflict of law rules." ECF 37-3 § 15.1; ECF 37-4 § 17.1. Plaintiffs assert claims under California consumer protection statutes, and not under the agreement, so this choice of law clause does not apply. *See Fleetwood Servs, LLC v. Ram Capital Funding, LLC,*, 2022 WL 1997207, at *16 (S.D.N.Y. June 6, 2022) ("[I]n order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties.") (court's alteration). The Second Circuit has "long held that limited choice-of-law clauses, such as the one in the [Terms], merely specify the law that applies to claims *arising from the contract* but not to non-contractual claims (*e.g.*, consumer protection statutes sounding in fraud)." *Heskiaoff v. Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir. 2017) (emphasis in original); *see also Fleetwood Servs.*, 2022 WL 1997207, at *16 ("[A] 'choice-of-law provision that states this Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)' is 'not broad enough to reach tort claims incident to the contractual relationship.'")

8

(quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005)) (alteration omitted).

Because the Terms' choice of law clause clearly does not apply to Plaintiffs' claims, the Court performs a choice of law analysis to determine the law that applies. *Heskiaoff*, 719 F. App'x at 31. "New York conflicts law directs that the law of the jurisdiction having the greatest interest in the litigation will be applied. Interest analysis is a flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157–58 (2d Cir. 2012) (cleaned up). Where, as here, "conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.*

Interest analysis requires the application of California law to Plaintiffs' claims. California has the greatest interest in regulating the conduct of California companies and protecting California residents from deceptive practices that violate California law. *See Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009) (cleaned up) (discussing "California's 'strong public policy' to 'protect consumers against unfair and deceptive business practices'"). The Second Circuit addressed similar facts, only inverted, in *Heskiaoff v. Sling Media, Inc.*, and concluded that New York law— the state where plaintiffs bought their products—applied to "non-contractual claims (*e.g.*, consumer protection statutes sounding in fraud)" because "Plaintiffs bought [Defendant's product] in New York and were New York residents at the time of their purchases." 719 F. App'x at 29. Here, all Plaintiffs bought Defendant's products in California and were California residents when they made their purchases, ¶¶ 12-14, so California law applies under the logic of *Heskiaoff.*

9

Further, California's interest in this case is even stronger because *not only* do the plaintiff residence and purchase location factors that drove the *Heskiaoff* court's decision favor the application of California law here, but California is *also* the location where Defendant Zynga is located and where it engaged in the tortious conduct. Zynga was founded in California and maintains its headquarters there—where it employs hundreds of people, including its leadership team and key executives responsible for Zynga's acquisition of the Games and "turbocharg[ing] their growth." ¶¶ 20-26.

Defendant does not challenge any of this, and relies exclusively on its misguided argument that the choice of law provisions in the Terms govern Plaintiffs' claims here, without citing any authority supporting its interpretation. But even if the Court somehow construed this choice of law clause against its plain language to encompass Plaintiffs' claims, it would still be unenforceable because (a) there is no reasonable basis to apply New York law to claims by California consumers against a California company for conduct that occurred exclusively in California; and (b) it would violate the fundamental public policy of California to allow a California company to use a New York choice of law clause to evade California's consumer protection statutes.

Defendant primarily points to the fact that its parent company is headquartered in New York, but that is irrelevant because "it is bedrock law that subsidiaries are distinct legal entities from their parent corporation" so the location of a corporate affiliate "is therefore of little relevance as to whether there is a reasonable relationship" to New York. *DarkPulse, Inc. v. Crown Bridge Partners, LLC*, 2026 WL 696787, at *7 (S.D.N.Y. Mar. 12, 2026). Other than the location of Defendant's parent, "[a]ll of the other contacts are outside [New York]" and so Plaintiffs' claims are not reasonably related to New York. *See Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 420 (S.D.N.Y. 2023) (state of incorporation of one party insufficient in comparison to all

10

other factors). No court has ever held that the mere presence of a parent company in New York establishes a reasonable relationship.

Defendant's authorities are inapposite. *See* MTD at 7. In *Henry v. Major League Baseball Advanced Media*, *L.P.*, 2025 WL 3717068, at *8 (S.D.N.Y. Dec. 23, 2025), *r&r adopted*, GHW, 2026 WL 45345 (S.D.N.Y. Jan. 7, 2026), the defendant (not a corporate affiliate) was headquartered in New York and plaintiff "concede[d]" that established sufficient contacts. *Id.* at *8. In *Stevens & Co. LLC v. Espat*, 2025 WL 950989 (S.D.N.Y. Mar. 28, 2025), one of the parties was located in New York and the other party had done "at least some portion of his work for the [party] in New York." *Id.* at *8.

Defendant also points to Plaintiffs' sending opt-out notices to the New York address required by the agreement as a New York contact, but Defendant cannot rely on this insignificant administrative act to conjure a New York connection. Nor does a non-party to this litigation's interest in having New York law apply somehow transform into a New York contact. Plaintiffs' claims are based on their transactions in California with a California entity. Because there are insufficient contacts with New York, the Court should not enforce the choice-of-law provision even if it applies. *Cambridge Cap.*, 675 F. Supp. 3d at 423 (choice of law clause unenforceable for lack of contacts, regardless of public policy considerations).

Even if these tenuous connections created a reasonable relationship with New York, the Court should apply California law on public policy grounds. While, as Judge Illston also observed, there is conflicting case law on this issue, Plaintiffs urge the Court to follow the reasoning of cases holding that, even if the contract selects New York law, a "court should consider whether a choice-of-law provision . . . violates a fundamental policy of a state with a materially greater interest than the chosen state." *Fleetwood Servs.*, 2022 WL 1997207, at *15; *Medtronic, Inc. v. Walland*, 2021

11

WL 4131657, at *6 (S.D.N.Y. Sept. 10, 2021) ("[T]he interests of a foreign jurisdiction are still relevant to the Court's conflicts-of-law analysis.").

Here, every meaningful contact is in California. California clearly has an important interest in preventing California companies from evading its regulations by the simple expedient of establishing a corporate parent in a different state and then forcing that state's law on consumers in a contract of adhesion. Defendant contends that New York law would bar Plaintiffs' claims, so New York law is contrary to "California's 'strong public policy' to 'protect consumers against unfair and deceptive business practices.'" *Doe 1*, 552 F.3d at 1084 (cleaned up). "Thus, because California has a materially greater interest than does New York, and because New York law would violate a fundamental public policy of California, the law of California governs the instant suit, contrary to the choice-of-law provision." *Medtronic*, 2021 WL 4131657, at *7.

Finally, Defendant is estopped from arguing that New York law applies in any event. It obtained a transfer by arguing that the New York court could apply California law, Dkt. 44 at 14 & n.9; Dkt. 51, the transferor court accepted that argument, Dkt. 56 at 10–11, and Defendant would unfairly benefit if it were allowed to now triumphantly argue that New York law applies so Plaintiffs' claims must be dismissed. *See Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2018 WL 4360777, at *3 (S.D.N.Y. Aug. 15, 2018) (party estopped from choice of law argument).

### B. Plaintiffs adequately state their California claims.

#### 1. Plaintiffs easily satisfy rule 9(b).

Defendant's Rule 9(b) arguments, MTD at 10-11, 13, ignore relevant legal standards and Plaintiffs' detailed allegations. "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 144 (D. Conn. 2024) (quoting *Van Mourik v. Big Heart Pet Brands, Inc.*, 2018 WL 1116715, at *4 (N.D. Cal. Mar. 1, 2018)).

12

"The rule is not rigid, and . . . . [a] complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." *Id*. (quoting *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir. 1989) and *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016)).

Plaintiffs' detailed allegations and screenshots specifically describe the various types of deceptive statements Defendant presented to them during the time periods at issue, identifying the "who, what, when, where" of the alleged fraud. *Binder v. Michael Kors (USA), Inc.*, 2024 WL 3227943, at *11 (S.D.N.Y. June 28, 2024) (Rule 9(b) satisfied even where plaintiffs did not allege "the prices of the particular items purchased by Plaintiffs" because "'the Complaint nevertheless alleges sufficient facts about a uniform course of conduct to plausibly support a conclusion that the same allegedly fraudulent practices applied to the items Plaintiff purchased'") (quoting *Dahlin v. Under Armour, Inc*., 2020 WL 6647733, at *4 (C.D. Cal. July 31, 2020)); *see Guerriero v. BB OPCO, LLC*, 2026 WL 878716, at *5 (S.D.N.Y. Mar. 30, 2026) (same); *Vizcarra v. Michaels Stores, Inc.*, F. Supp. 3d, 2024 WL 64747, at *7 (N.D. Cal. Jan. 5, 2024) (where a plaintiff alleges a "blanket" practice, "[e]ven under Rule 9(b), there is no reason to require [plaintiff] to individually investigate and track the prices of every [] product" because the allegations "would clearly apply to all [] products during the investigated time period").

Plaintiff Daugherty alleges hundreds of frequent in-app purchases from the Games during a 31-month time period and attached an Appendix listing her transactions. ¶ 12, App'x A. These include spending at least $279 spent on the "Special Offer" packs, ¶ 12, which are advertised with massive fake discounts, like "70% off." ¶¶ 53–54. Plaintiffs Camargo and Garcia also allege the specific time frame where they made frequent in-app purchases, and allege that they made purchases of the packs illustrated in the complaint, including packs that were advertised as being

13

on sale or offering massive discounts. ¶¶ 13–14.  The complaint then details the types of packs and their false advertising of discounts. ¶¶ 39–54. Plaintiffs allege further that these deceptive packs are used constantly throughout the Games. ¶¶ 55, 65. These allegations are even buttressed with details about Defendant's patented technologies that it uses in the Games to "aggressively target revenue features" with "flash sales," and how it has perfected its pattern of fake discounts to sell items at a price and at a specific discount percentage tailored to each user. ¶¶ 78-79, 82-85. It is therefore "entirely reasonable to conclude that plaintiffs' particular items were subject to the same pricing practices that defendant applied to the numerous other items." *Binder*, 2024 WL 3227943, at *11; *Guerriero*, 2026 WL 878716, at *5, 7 ("The Complaint 'alleges sufficient facts about a uniform course of conduct to plausibly support a conclusion that the same allegedly [deceptive] practices applied to the items Plaintiff purchased.'") (quoting *Binder*, 2024 WL 3227943, at *11).[3]

Defendant does not challenge that under California law allegations of fake discounts plausibly allege that a reasonable consumer would be misled. Nor could it, as courts routinely hold that allegations of fake discounts and how they would mislead a reasonable consumer suffice at the pleading stage. *See* ¶¶ 5, 65–69; *Binder*, 2024 WL 3227943, at *8 ("[A]t this stage, the Court cannot hold, as a matter of law, that it is impossible for the Plaintiffs to prove that the pricing practices at issue are misleading to a reasonable consumer.") (collecting cases); *Morrow v. Ann Inc.*, 2017 WL 363001, at *7 (S.D.N.Y. Jan. 24, 2017) ("[T]he reasonable consumer question is usually a question of fact best left to a jury and not decided by the Court at the motion to dismiss stage. . . . Moreover, the very fact that [defendant] represented its prices as discounted suggests

---

[3] Notably, Defendant has the best information about the exact misleading advertisements that were shown to Plaintiffs and when, as well as detailed information on all of Plaintiffs' purchases. This is not a case where Plaintiff alleges some amorphous fraudulent scheme and Defendant is unable to identify the transactions or interactions at issue—the FAC clearly provides all the who, what, when, and where information Defendant needs to have fair notice of basis for the claims.

14

that such representations might impact reasonable consumer purchasing decisions.") (cleaned up).

Defendant's arguments about lack of standing under California law ignore the vast body of case law finding that allegations of overpaying for a product advertised with false sales or discounts establishes injury. *Binder*, 2024 WL 3227943, at \*6-7 (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013)). Defendant's authority, *Mai v. Supercell Oy*, 2024 WL 2077500, at \*1 (9th Cir. May 9, 2024), is a case about "loot boxes," not the type of predatory false discounting schemes widely accepted as establishing injury. Moreover, in *Mai*, there were no allegations about the named plaintiffs' addiction. *See id.* But here, Plaintiffs detail their addictions and specifically allege that because of Defendant's patented processes around false and misleading sales tactics and intentionally addicting game design, all Plaintiffs made in-app purchases in the Games at higher prices and higher frequencies than they otherwise would have. ¶¶ 14–16, 62–68.

### 2. The CLRA covers Defendant's conduct here.

Defendant incorrectly argues "that the CLRA does not apply to virtual items." MTD at 14. The CLRA prohibits unfair competition and deceptive practices "in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 770(a). "Services" include apps like Defendant's as an entertainment service, because the CLRA covers "services for other than a commercial or business use," like the personal enjoyment of a game on one's mobile device. Cal. Civ. Code § 1776(a) & (b); *see Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1263 (N.D. Cal. 2022) ("Roblox provides users access to its metaverse, which is comfortably classified as an online entertainment service."). In-app purchases like game packs are "transaction[s] . . . to make use of a part of that entertainment service," and therefore fall within the scope of services under the CLRA. *Id.* In the FAC, Plaintiffs allege that the in-game packs (and indeed, the games themselves) are *either* a good or a service "within the meaning of Cal. Civ. Code. §§ 1761(a) and (b)." ¶ 213.

15

Although some early decisions held that in-app purchases do not fall within the ambit of the CLRA, they are distinguishable and do not reflect the current state of the law. In *Doe v. Epic Games, Inc.*, the Court dismissed the plaintiff's proposed class action claims under the CLRA relating to the purchase of in-app "digital content" in the game Fortnight. *See Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (cited in MTD at 9). However, the in-app purchases in that case could not be made directly with real money. Instead, players had to buy virtual currency, which could then be used to make in-app purchases. *Epic Games,* 435 F. Supp. 3d at 1046. No such intermediate transaction exists in this case: the game bundles are purchased directly with real money. This is precisely the kind of transaction related to use of a service that the CLRA and other consumer protection laws are designed to cover. In this respect, Defendant's citation to the now-vacated district court decision in *Mai v. Supercell Oy*, is inapposite as it relied on *Epic Games* and dealt with the purchase of virtual currency, not in-game items purchased with actual money. *See Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1136 (N.D. Cal. 2023), *vacated and remanded*, 2024 WL 2077500 (9th Cir. May 9, 2024).

Moreover, Judge Gonzalez Rogers also declined to follow her own prior *Epic Games* decision in a later decision related to the Fortnite game. *C.W. v. Epic Games, Inc.*, 2020 WL 5257572, at *4 (N.D. Cal. Sept. 3, 2020) (Gonzalez Rogers, J.). In that case, the Court tentatively concluded it was "plausible" that the game "may be a cross-over product"—meaning an entertainment service and not merely software—subject to the CLRA, and that dismissal should not occur "absent a full record . . ." *Id.* Just like with *Epic Games*, as courts have continued to grapple with deceptive business practices in digital gaming, the weight of case law has shifted towards Plaintiffs' position: gaming apps are entertainment services, in-app purchases are a part of that entertainment service, and thus are subject to the CLRA. *See, e.g.*, *Ochoa v. Zeroo Gravity*

16

*Games LLC*, 2023 WL 4291650, at *13 (C.D. Cal. May 24, 2023) (false advertised discounts in mobile game constitute a "good or service" under the CLRA "[i]n light of the CLRA's underlying purpose to protect consumers and the liberal construction with which courts should interpret it"); *Roblox*, 602 F. Supp. 3d at 1263–64 ("[W]hen a consumer buys in-game currency, she is engaging with the online entertainment service in one of the key ways consumers are intended to. That transaction is at the core of the 'service.'").

### 3. Plaintiffs adequately allege addictiveness as a component of their claims.

Defendant argues that Plaintiffs do not plead addiction with specificity, cannot bring claims for "addictive" content, and in any event, Defendant's conduct is protected by the First Amendment. MTD at 15–18. None of these arguments have merit.

Defendant argues that Plaintiffs do not "connect the Games' allegedly addictive properties with any increase in Plaintiffs' spending." MTD at 15. However, Plaintiffs allege in detail how Defendant uses what the FTC refers to as "dark patterns," *i.e.* psychologically manipulative deceptive sales tactics, to foster addiction and drive in-app purchases. ¶¶ 69-87 (explaining the specific game features that drive addiction with citations to scientific literature, and identifying specific Zynga patents that it uses to creative addictive behaviors and prime users for deceptive marketing). It also contains specific allegations about how these tactics affected Plaintiffs, who all allege they became addicted to the games. Dougherty spent upwards of four to five hours a day on Toy Blast, spending nearly all her free time on the game. ¶ 12. Plaintiff Camargo spent two to three hours a day playing Toon Blast every day of the week, and even lost sleep playing it. ¶ 13. Plaintiff Garcia played it morning through night, and consistently played Toon Blast from five to nine hours a day. ¶ 15. As but one example allegation, "by tricking players into making many smaller, time-sensitive purchases of purportedly high-value packs that are nominally on "sale" or heavily discounted for a limited time, Defendant deliberately fosters addictive behaviors and lures

17

consumers into dangerous spending habits—similar to a gambling addiction." ¶ 72; *see also* ¶ 73 ("Defendant also fosters addiction by offering a shifting catalogue of deceptive sales. Players are unsure whether and how often the 'sales' will be repeated. Variable rewards, meaning positive results that manifest with unknown likelihood, are a staple of addictive video game design.").

Defendant also points to cases dismissing *gambling* claims based on definitions of unlawful gambling. MTD at 16. But Plaintiffs are not bringing claims under gambling statutes. Nor, as Defendant concedes, are they bringing standalone addictiveness claims. Plaintiffs UCL, FAL and CLRA claims are based on Defendant's deceptive sales tactics, which use digital means to mirror various false discounting tactics that have long been held unlawful under these statutes. The addictive nature of Defendant's gaming application is relevant to these allegations because—as explained in Defendant's own patents—its tactics make consumers more likely to fall prey to its deceptive marketing by creating pressure to purchase the items so they can advance in the Games. ¶¶ 76–87. This compounds and reinforces the deceptive and unfair nature of Defendant's false discounting.[4] In sum, Plaintiffs do not allege any stand-alone causes of action based solely on addictiveness, so there is nothing to dismiss. *Cf. Mai*, 648 F. Supp. 3d at 1136 ("Claim 1 asserts that Supercell violates the unlawful prong of the UCL by possessing or operating games containing loot boxes in violation of various state and federal gambling statutes.")

Finally, the First Amendment does not shield Defendant from liability for the addictive

---

[4] For example, Plaintiffs allege at ¶¶ 82–83: Defendant has "perfected its pattern of fake discounts to sell items at a price and at a specific discount percentage tailored to each user. As Defendant's Patent . . . "Customized offers for sales of combinations of virtual items," explains, Zynga has developed a model to choose the discounts and sales that it believes will appeal best to each user. Zynga openly admits the presentation is deceptive: "The presenting suggests that the combination of virtual items is randomly selected from a set of virtual items or that the discounted price is randomly selected from a set of discounted prices. However, in actuality, the combination of virtual items or the discounted price may not be selected randomly."

nature of the Games. Defendant's use of dark patterns and psychologically manipulative design tactics to pressure players into making in-app purchases based on the false advertisements is exactly the type of speech that courts have repeatedly concluded does not merit protection under the First Amendment. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1119 (9th Cir. 2021) *(*quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."). The cases Defendant relies on do not hold otherwise, and involve the presentation of content that was not alleged to be false or unlawful. None of those authorities suggest that design features that push deceptive marketing on users are somehow protected by the First Amendment. For instance, in *Courtright v. Epic Games, Inc.*, 795 F. Supp. 3d 1156 (W.D. Mo. 2025), the claim lacked similar allegations of deception and centered rather on allegations that "their video games are made too entertaining." *Id.* at 1166. Here, however, if theoretically the First Amendment might protect Defendant's choices to make Games compulsively addictive, it still would not protect Defendant from leveraging that addiction to make users like Plaintiffs susceptible to its false and deceptive marketing tactics.

### 4. Plaintiffs have standing to seek injunctive relief under California law.

Defendant's argument against standing ignores Plaintiffs' allegations about future risk of harm and that they have standing to seek public injunctive relief under California law. *See* MTD at 12-13. Plaintiffs allege that they are addicted to the Games, "play and/or may still play the Games and be deceived and pressured into making in-app purchases." ¶ 203. Plaintiff Dougherty alleges she specifically still plays Toon Blast twice a week. ¶ 12. Read in the context of the FAC's detailed allegations concerning the addictive nature of the Games and the constant presentation of targeted false advertising, this is not a "vague" allegation. MTD at 12.

All Plaintiffs hope they will not fall prey to Defendant's deceptive advertising, but face a

19

serious and present risk that they will be unable to resist based on Defendant's high pressure and manipulative sales tactics and addictive game design. ¶ 75. And although Plaintiffs may now be able to identify certain "sales" and "discounts" they have previously viewed as deceptive, it does not follow that they have become experts in identifying every different and targeted way that Defendant may present them with deceptive future advertising. Again, Defendant employs an "offer-generation module" that uses a variety of data points about an individual user to present a "sale" that is most likely to cause the player to make a purchase, including "the combinations of virtual items and discount percentages that are most likely to increase revenues received by an operator of the game networking system." ¶ 85. Absent an injunction, Defendant will continue using these technologies to try to find the right combination of tactics and artificial discount to pressure Plaintiffs and the public into making additional purchases.

Defendant does not challenge Plaintiffs' standing to seek permanent injunctive relief. Nor can it: The injunction Plaintiffs seek also satisfies the standards for providing a public benefit and not only a private one. Plaintiffs seek relief that would require Defendant to change the manner in which it discloses its prices and fees to all customers on the app," therefore it "would benefit the public as a whole." *Khan v. Coinbase, Inc.*, 2025 WL 2985378, at *9 (Cal. Ct. App. Oct. 23, 2025) ("[T]he allegedly unlawful business practices Khan seeks to enjoin pertain to Coinbase's continuing operation of an online currency exchange that is accessible and available to the general public. The relief he seeks would require Coinbase to change the manner in which it discloses its prices and fees to all customers on its Simple Trade platform.").[5]

### C. Plaintiffs have been injured under New York law.

Even if the Court were to conclude that New York law applies, Plaintiffs' claims may still

---

[5] Plaintiffs withdraw their unjust enrichment claims.

proceed. Defendant is correct that, unlike well-established California consumer protection law, New York courts typically do not consider a plaintiff who was misled by a fake discount on a physical item as being actually injured because New York rejects the "deception as injury theory" that California law allows. *See* MTD at 9. But the facts here are unlike going to a shop and purchasing a tangible product, as in the "outlet store" cases where New York courts find no injury because plaintiffs were able to understand what they were purchasing and what they ultimately received.

As Defendant's own authority observes, notwithstanding New York's rejection of "deception as injury theory," it still recognizes a cognizable injury based on addiction when that is also tied to injury. In *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43 (1999), the case cited by courts in rejecting New York-based false discounting claims under the "deception as injury theory" reasoning, the New York Court of Appeals nonetheless recognized that plaintiffs *could* have alleged injury based on the addictiveness of cigarettes. *Id.* at 56. But "plaintiffs abandoned the addiction component of the legal theory" and "[w]ithout addiction as part of the injury claim, there is no connection between the misrepresentation and any harm from, or failure of, the product." *Id.*

Defendant markets the Games as "free to play," ¶ 3, but designs them to be addictive, and then layers on high-pressured sales tactics and false discounts to exploit addiction and force users, like Plaintiffs, to make frequent in-app purchases, ¶ 4-7. *See also* ¶¶ 72, 73. Plaintiffs all allege that because of Defendant's deceptive tactics and intentionally addicting game design, they made in-app purchases in the Games at higher prices and at higher frequencies than they otherwise would have. ¶¶ 13–16. Plaintiffs therefore adequately allege an injury under New York law.

Moreover, they also adequately allege a cognizable price premium theory—that they paid more for the products worth less than advertised, which Defendant recognizes is an actionable

theory. *See* MTD at 10. New York courts have also recognized unique circumstances in which false discounting allegations establish a price premium. *Guerriero v. BB OPCO, LLC*, 2026 WL 878716, at *7 (S.D.N.Y. Mar. 30, 2026). Here, Plaintiffs allege much more than just seeing a false claim of discounted sales. Defendant designed its games intentionally to be addicting, and on top of that, uses all other sorts of high-pressured tactics to coerce Plaintiffs into making purchases they otherwise would not have made. Defendant's false countdown timers and claims of limited time sales create pressure to buy immediately. ¶ 63, 53, 48. In the context of addictive game design and high-pressured sales tactics, Defendant's false discounts make players believe they are purchasing a pack containing items worth the price of non-discounted packs. ¶¶ 50–52. As one example, Defendant's $4.99 Team Pack, sold with a 70% discount (and a countdown timer to pressure a sale), suggests that the Team Pack is actually worth more than $15. But non-discounted packs sold at that price contain far more valuable items. ¶ 52. Thus, Plaintiffs did not receive a pack with the same quality it was advertised. This is not a situation where a plaintiff calmly looks at different options of clothing to purchase and decides whether they are worth the amount on the price tag; here Plaintiffs are rushed and tricked into making purchase decisions, without the opportunity to evaluate and understand what they are receiving.

### D. Plaintiffs state claims under the VPPA.

Defendant's VPPA arguments ignore the VPPA's statutory text, Second Circuit precedent, and Plaintiffs' allegations. First, as to the argument that Plaintiffs do not allege PII was disclosed because they have not "requested 'specific' video ads," MTD at 18-19, Defendant ignores the text they cite—that the VPPA applies to individuals "as having requested *or obtained* specific" video ads. 18 U.S.C. § 2710(a)(3) (emphasis added). Plaintiffs "obtained specific" video ads by watching

22

them in the Games.[6]

Second, Defendant ignores Plaintiffs' specific allegations about what was shared and with whom. Defendant expressly admits to violating the VPPA in a specific pop-up displayed to Toon Blast and Toy Blast users stating that Zynga "share[s] your personal and video viewing information with third party services for advertising and analytics purposes," ¶¶ 118–119, and a statement "in the Toon Blast privacy center" that states "in order to personalize ads, we allow certain online advertising partners to collect information about you, e.g. profile information you provide us, your device Advertising ID and other device information." ¶ 121. Plaintiffs also allege how Zynga extensively tracks user activity and shares it with its third-party marketers for personalized and targeted advertising. ¶¶ 109, 114–115. For instance, Zynga's Privacy Policy reveals how it performs this "targeting," and admits that Zynga shares a wide range of PII and a user's game activity with third parties, including by creating and sharing personalized profiles of its users. ¶¶ 111–115.[7]

This is more than sufficient circumstantial evidence to plausibly show a VPPA violation and satisfy the Second Circuit's "ordinary person standard." *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025). Combined with Defendant's admission of liability (which alone is sufficient), Plaintiffs' additional allegations about how Defendant engages in targeted video advertising and shares information about its users to third-party marketers, and that Defendant

---

[6] This argument also improperly relies on Defendant's assertion that "players cannot choose the ads that are presented in the game," but a motion to dismiss cannot be based on Defendant's factual contentions, even if the complaint "does not allege otherwise." MTD at 19.

[7] Defendant argues that Plaintiffs "mischaracterize excerpts" from the policy. MTD at 21. But the language is clear and even if it were susceptible to multiple interpretations, the Court would read it in the light most favorable to Plaintiffs on this motion. Likewise, Defendant's admission that Plaintiffs' allegations "imply" unlawful conduct, MTD at 21, concedes that they support a reasonable inference of unlawful conduct, which is all that is required to state a claim. *Id.*

makes substantial profit off of sharing this information, constitute "circumstantial evidence to infer that [Defendant] disclosed customer information in a non-VPPA-compliant manner." *See Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *4 (N.D. Ill. June 4, 2024) ("Here, the Annual Reports, the privacy policy, and the press report offer sufficient circumstantial evidence to infer that Fubo disclosed customer information in a non-VPPA-compliant manner"); *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 639 (N.D. Ill. 2024) ("Campos does not need a 'smoking gun' in her complaint. The relevant pieces of circumstantial evidence, such as Tubi's own words saying that it might engage in various aspects of the accused conduct, in conjunction with the other factual allegations about Tubi's practices, its emphasis on hyper-specific ad targeting, and business model—some supported by suggestive documentary evidence—are sufficient to support the plausibility of Campos's claim."). For instance, "although the Privacy Policy does not explicitly say that it shares the relevant VPPA-PII combination with third parties, it does state that it discloses both categories of information." *See Campos*, 716 F. Supp. 3d at 639.

Third, Defendant did not share this information in the "ordinary course of business." MTD at 22. Zynga incentivizes players to watch the video advertisements. ¶¶ 91–92. For instance, "when users run out of moves to beat a level, they can watch video advertisements to get additional moves. Users are also occasionally able to receive additional in-game items by watching video ads." ¶ 92. Defendant does this so that it can capture and sell their data and then "profit from selling targeted advertising." ¶ 106. Courts at the motion to dismiss stage regularly hold that "sharing of Plaintiffs' video viewing history for the marketing purposes . . . is not in the ordinary course of business within the meaning of the VPPA." *Sutton v. TED Found., Inc.*, 2026 WL 207000, at *9 (S.D.N.Y. Jan. 27, 2026) (collecting cases).

Fourth, Defendant's arguments about "subscribers" and "video tape service provider,"

24

MTD at 20, ignore statutory text and Second Circuit precedent. The plain language of the VPPA protects "any renter, purchaser, or subscriber of goods or services." Plaintiffs made in-app purchases, so they are "purchaser[s]" of Defendant's "goods or services." *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 551-53 (2d Cir. 2024) ("goods or services" under VPPA is not only video services). Zynga also is a "video tape service provider," which is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). This definition is broad and applies to entities "dealing in primarily *non*-audiovisual materials." *Salazar* 118 F.4th at 548. In Zynga's own words: "Essentially, video is video, no matter where it appears." ¶ 107. Zynga made ***$302.5 million*** in mobile game advertising revenue in 2020 and Defendant's *own* statements note how it "derive[s] a significant portion of our revenues from advertisements." ¶¶ 95, 98–100.

Fifth, Plaintiffs have standing at this stage to bring proposed class claims based on similar mobile apps. That argument sounds in typicality or adequacy, and is part of a Rule 23 analysis. *Cf. Gill v. Nat'l Football League*, 2021 WL 5087900, at *8 (S.D.N.Y. Nov. 2, 2021) (Engelmayer, J.) ("In something of a Hail Mary, defendants, finally, attempt to strike the FAC's class allegations, arguing that, on the face of the FAC, class certification is necessarily unsustainable."). And unlike Defendant's authority, Plaintiff's claims are based on Defendant's uniform conduct among its mobile applications and video advertising, and thus would not "'turn on very different proof'" for different mobile apps. *Afriyie v. NBCUniversal Media, LLC*, 775 F. Supp. 3d 791, 801 (S.D.N.Y. 2025). The Court can revisit this argument at the class certification stage if warranted.

## V.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

Dated: May 15, 2026                              Respectfully submitted,


                                                 **JANOVE PLLC**

                                                 By: */s/ Raphael Janove*
                                                 Raphael Janove
                                                 115 Broadway, 5th Fl.
                                                 New York, NY 10006
                                                 646-347-3940
                                                 raphael@janove.law

                                                 Liana Roza Vitale
                                                 979 Osos St., Ste. A5
                                                 San Luis Obispo, CA 93401
                                                 805-505-9550
                                                 liana@janove.law

                                                 *Attorneys for Plaintiffs*
                                                 *and the Proposed Classes*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(c), I hereby certify that this brief contains 8,468 words, including footnotes but excluding text specified in Local Rule 7.1(c).

Dated: May 15, 2026

*/s/ Raphael Janove*
Raphael Janove
