UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHERYLL DOUGHERTY *et al.*, Plaintiffs, -v- ZYNGA INC., Defendant. | 26 Civ. 2772 (PAE) <br> OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

Plaintiffs bring this putative class action on behalf of players of the mobile video games Toon Blast and Toy Blast (collectively, the "games"), published by defendant Zynga Inc. Dkt. 33 ("AC") ¶¶ 1–2. Plaintiffs allege that Zynga uses deceptive marketing strategies to push in-app purchases and that it discloses players' personally identifiable information to third parties without the players' consent. *Id.* ¶¶ 4, 10.

Pending now are Zynga's motions to compel arbitration of these claims and, in the alternative, to dismiss the amended complaint. Dkts. 61, 63. For the following reasons, the Court grants the motion to compel arbitration and denies the motion to dismiss as moot.

# I. Background[1]

## A. The Parties

Zynga is a video game developer and publisher founded in 2007 and headquartered in San Mateo, California. *Id.* ¶¶ 2, 21. Since May 2022, it has been a wholly owned subsidiary of Take-Two, a video-game publisher. *Id.* ¶ 2; Dkt. 25-2 ("Ungberg Decl.") ¶ 24. In July 2020, Zynga acquired Peak Games, an Istanbul-based company that created and released Toy Blast in 2015 and Toon Blast in 2017. Ungberg Decl. ¶ 5. Toy Blast and Toon Blast are "tile matching" games in which players progress through levels by selecting groups of similar tiles and clearing the board over a series of moves, akin to Candy Crush. AC ¶ 30.

Plaintiffs Cheryll Dougherty, Delia Camargo, and Lawrence Garcia are current or former California residents. *Id.* ¶¶ 12–14. While residing in California, they played at least one of the games. *Id.* Dougherty and Camargo each still play at least one. *Id.* ¶¶ 12–13.

## B. Allegations in the Amended Complaint

According to the AC, plaintiffs are or were habitual users of Toon Blast and/or Toy Blast. *Id.* ¶¶ 12–14. Each estimates playing one or both games for multiple hours per day, and, in doing so, each spent substantial sums on in-app purchases. *See id.* ¶¶ 12 (Dougherty spent at least $1,200, across more than 465 transactions, during a 31-month period during which she played Toy Blast four to five hours per day), 13 (Camargo spent more than $1,000 in playing Toon Blast for two to three hours every day for eight years), 14 (Garcia spent hundreds of dollars

---

[1] The Court draws these facts from the Amended Complaint, Dkt. 33 ("AC"); a declaration submitted by Zynga, Dkt. 65-2 ("Ungberg Decl."); and related exhibits, Dkts. 65-2 ("2024 Terms"), 65-3 ("2025 Terms"). On a motion to compel arbitration, the Court applies a standard "similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). The Court therefore may consider materials outside the Complaint, such as affidavits and other admissible evidence. *See, e.g.*, *HBC Solutions, Inc. v. Harris Corp.*, No. 13 Civ. 6327, 2014 WL 6982921, at *1 (S.D.N.Y. Dec. 10, 2014).

while playing Toon Blast five to nine hours a day for two to three years). Dougherty and Garcia, to supplement in-app purchases, have watched pre-recorded video advertisements in Toon Blast to advance the game and collect additional rewards. *Id*. ¶¶ 12, 15.

Plaintiffs allege that Zynga employs deceptive marketing strategies to pressure players to make in-app purchases of extra lives, rewards, and other tools to facilitate advancement through the games, which are marketed as free. *Id*. ¶ 3. They fault Zynga for promoting in-app purchases by marketing game-advancing tools at perpetual, steep discounts. *Id*. ¶¶ 39–47. These discounts, plaintiffs allege, inflate the items' standard prices (and thus the size of the discounts) and the offers' time-sensitivity. *Id*. Plaintiffs further allege that, through in-app video advertisements, Zynga collected their personally identifiable information and viewing history and shared such with third parties. *Id*. ¶ 106. Plaintiffs bring claims under California's Unfair Competition Law, *id*. ¶¶ 179–203, California's False Advertising Law, *id*. ¶¶ 204–209, the California Consumers Legal Remedies Act, *id*. ¶¶ 210–222, and the federal Video Privacy Protection Act, *id*. ¶¶ 235–245; and for fraud, *id*. ¶¶ 223–230, and unjust enrichment, *id*. ¶¶ 231–234.

### C. The Games' Terms of Service

#### *a. The Peak terms*

Since 2018, the games have published pop-up notices requiring all players to agree to the operative terms of service in order to play the games and make in-app purchases. Ungberg Decl. ¶¶ 15–17. When a player downloads and opens either game, a notice appears, informing the player that by clicking "ACCEPT" they agree to the applicable terms. *Id*. ¶ 16. The notice includes hyperlinks to those terms, which appear in blue, underlined font. *Id*. ¶ 17. If a player clicks the hyperlink, the terms' full text appears in a web-browser window on the player's mobile device. *Id*. ¶ 18. The most recent terms are also permanently accessible on the Take-Two

website. *Id*. When the terms are updated, the games display a new, similar pop-up notice, and users must click "ACCEPT" to continue to the games. *Id*. ¶ 19.

Starting in June 2018, Peak Games required players to accept terms of service in order to play the games. *Id*. ¶ 20. These, the "Peak terms," were governed by Turkish law and required that any claims be brought in Turkish courts. *Id*. ¶ 22. The Peak terms remained in effect for the games after Zynga acquired Peak in 2020. *Id*. ¶ 21. Take-Two acquired Zynga in May 2022, and from then until February 2024, the Peak terms remained in effect for the games. *Id*. ¶¶ 24–25.

*b. The 2024 Take-Two terms*

In February 2024, Take-Two implemented the 2024 Take-Two terms of service (the "2024 Take-Two terms"). *Id*. ¶ 27. On or around January 25, 2024, a pop-up notice informed users who opened the games that the terms of service would change on February 28, 2024, and that users would be required to accept the new terms in order to continue playing. *Id*. ¶ 28. On or around February 28, 2024, the games implemented a pop-up notice indicating that the 2024 Take-Two terms were operative and requiring that players accept the terms to proceed to gameplay. *Id*. ¶ 29.

The 2024 Take-Two terms "cover the terms and conditions by which [Take-Two] offer[s players] access to use [its] games, apps, products, websites, and other services." Dkt. 65-2 ("2024 Terms") at 2. They are governed by New York law and require that any non-arbitrable claims be litigated in a federal or state court in New York, New York. *Id*. § 15.1.

Above the terms' table of contents, users are advised to "take particular care" when reviewing the section governing mandatory arbitration. *Id*. at 2. The mandatory arbitration section provides that, if users "have an issue with the Services that cannot be resolved by contacting our Customer support, this section 15.5 (the 'Arbitration Agreement') explains how

you and Take-Two agree to resolve any Disputes by binding, individual arbitration, subject to certain limited exceptions." *Id*. § 15.5. The section contains a delegation clause, which requires that "any dispute, claim, or controversy arising from or related to the Services, including those related to the formation, breach, termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement," be "exclusively resolved by individual, binding arbitration." *Id*. § 15.5(1). It further provides that "[t]he arbitrator—not a federal, state, or local court, or government agency—shall have exclusive authority to resolve any [disputes], including those related to the interpretation, applicability, enforceability, or formation" of the arbitration agreement, and any claim that the agreement "is void or voidable." *Id*.

For individual consumer disputes, the 2024 Take-Two terms require individual arbitration with JAMS ADR ("JAMS") under the JAMS Streamlined Arbitration Rules and Procedures. *Id*. § 15.5(6). When five or more disputes "relating to the same or similar subject matter, which share common issues of law or fact, or in which the counsel or other organization representing the parties in such [] are the same [or] cooperating" are filed, the 2024 Take-Two terms instead require arbitration with New Era ADR ("New Era") under the New Era Mass Arbitration Rules (the "New Era rules") in effect when such disputes are filed. *Id*. § 15.5(9).

The 2024 Take-Two terms' section on mandatory arbitration prescribes procedures for opting out of the binding individual-arbitration requirement. *Id*. § 15.5(3). Parties wishing to opt out "must notify [Take-Two] in writing within 30 days of the date that [they] first accept" the agreement. *Id*.

The 2024 Take-Two terms reserve Take-Two's right to "update this Agreement, including the Arbitration Agreement, at [its] discretion." *Id*. § 15.5(11). If Take-Two changes

the terms of the arbitration agreement, users "may reject the new changes" by notifying Take-Two "within 30 days of the effective date of the changes [they] seek to reject." *Id*.

*c. The 2025 Take-Two terms*

On or around March 28, 2025, Take-Two deployed the 2025 Take-Two terms of service (the "2025 Take-Two terms") for the games. Ungberg Decl. ¶ 38. As before, the games implemented a pop-up notice indicating that the 2025 Take-Two terms were operative and requiring that players accept the terms to proceed to the game. *Id*. ¶ 40. The 2025 Take-Two terms largely track the 2024 Take-Two terms, with two exceptions principally relevant here.

First, instead of the New Era rules, the 2025 Take-Two terms subject mass arbitration disputes to the JAMS Mass Arbitration Procedures. *Id*. ¶ 42; *see also* Dkt. 65-3 ("2025 Terms") § 17.5. The 2025 Take-Two terms also limit the definition of "mass arbitration" to 25 or more related disputes, rather than five or more, as under the 2024 Take-Two terms. *See* 2025 Terms § 17.5(6).

Second, the 2025 Take-Two terms add to the otherwise largely identical opt-out provision the following statement:

> For clarity, if you accepted a previous version of the Arbitration Agreement and did not Opt Out, your Opt-Out Notice will be limited to the materially updated terms of this version. In this case, You and Take-Two will still arbitrate any Dispute under the terms of the Arbitration Agreement as of the date you first agreed to it or the effective date of the last version of the Arbitration Agreement you accepted.

*Id*. § 17.5(3).

*d. Plaintiffs' acceptance of the terms and opt-out attempts*

Camargo downloaded Toy Blast on July 18, 2016 and accepted the Peak terms in 2019. Ungberg Decl. ¶ 66. She downloaded Toy Blast on a different device and accepted the Peak terms on that device on December 11, 2020. *Id*. She accepted the 2024 Take-Two terms on

April 23, 2024, via an in-game pop-up. *Id*. She accepted the 2025 Take-Two terms on April 18, 2025, via an in-game pop-up. *Id*. Camargo opted out of the 2025 Take-Two terms by written notice, through plaintiffs' counsel, on April 25, 2025. *Id*. ¶ 64.

Garcia downloaded Toon Blast and accepted the Peak terms on September 14, 2018. *Id*. ¶ 70. He accepted the 2024 Take-Two terms on November 21, 2024, via an in-game pop-up. *Id*. He accepted the 2025 Take-Two terms on April 17, 2025, via an in-game pop-up. *Id*. Garcia opted out of the 2025 Take-Two terms by written notice, through plaintiffs' counsel, on April 25, 2025. *Id*. ¶ 68.

Dougherty downloaded Toon Blast and accepted the 2024 Take-Two terms on June 20, 2024, via an in-game pop-up. *Id*. ¶ 59. She accepted the 2025 Take-Two terms on April 21, 2025, via an in-game pop-up. *Id*. ¶ 60. Plaintiffs' counsel provided Zynga with two opt-out notices on Dougherty's behalf, purporting to opt out of the 2025 Take-Two terms—one dated April 17, 2025, and one dated June 17, 2025. *Id*. ¶¶ 56–57. Zynga disputes the validity of these notices because the first preceded Dougherty's acceptance of the 2025 Take-Two terms and the second was untimely, having been executed more than 30 days after Dougherty accepted the terms. *See* Dkt. 62 ("Mot.") at 17–18.

**D. Relevant Procedural History**

On May 9, 2025, plaintiffs brought this action in the Northern District of California. Dkt. 1. On July 18, 2025, Zynga moved to compel arbitration or, alternatively, to transfer the case to this District. Dkt. 25.

On March 31, 2026, Judge Illston granted Zynga's motion to transfer. Dkt. 56. Judge Illston found that each plaintiff formed a valid contract with Zynga through his or her acceptance of the games' terms: Camargo and Garcia under the 2024 Take-Two terms, and Dougherty under either the 2024 or 2025 Take-Two terms. *Id*. at 6–7. Judge Illston did not resolve whether

Dougherty validly opted out of the 2025 Take-Two terms because the provision salient to the motion to transfer—the forum-selection clause—was materially the same across the 2024 and 2025 terms. *Id*. at 7. Both versions identified this District as the proper venue for claims arising under the agreement. *Id*. In light of the parties' valid and enforceable agreement to litigate in this District, and Judge Illston's conclusion that there were no extraordinary circumstances justifying departure from that agreement, Judge Illston transferred the action to this District, where it was assigned to this Court. *See id*. at 7–12.

On April 24, 2026, Zynga filed these motions to compel arbitration and to dismiss. Dkts. 61–66. On May 12, 2026, plaintiffs opposed the motion to compel arbitration. Dkt. 74. On May 15, 2026, plaintiffs opposed the motion to dismiss. Dkt. 78. On June 5, 2026, Zynga replied in support of both motions. Dkts. 79–80.

## II. Applicable Legal Standards

When resolving simultaneous motions to dismiss and to compel arbitration, the Court "should generally rule on a motion to compel arbitration before proceeding to a merits-based motion to dismiss." *Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 181 (S.D.N.Y. 2018), *aff'd*, 837 Fed. App'x 841 (2d Cir. 2021) (summary order); *see also Kaiser v. StubHub, Inc.*, No. 24 Civ. 44, 2024 WL 3445059, at *3 (S.D.N.Y. July 17, 2024); *Rosehoff Ltd. v. Cataclean Ams. LLC*, No. 12 Civ. 1143, 2013 WL 2389725, at *10 (W.D.N.Y. May 30, 2013) (to assess merits arguments about "sufficiency of the claims in the complaint" would be "unnecessary and contrary to judicial economy" should case be stayed or dismissed on justiciability grounds). Accordingly, the Court first resolves Zynga's motion to compel arbitration.

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id*. § 2. To decide whether a dispute is arbitrable, a court

assesses: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (citation omitted). "Only if the court concludes an agreement to arbitrate exists does it determine . . . the scope of the agreement to arbitrate." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022).

In deciding motions to compel, courts "apply a standard similar to that applicable to a motion for summary judgment." *Jacobson v. Live Nation Ent., Inc.*, No. 24 Civ. 3994, 2026 WL 1864990, at *2 (S.D.N.Y. June 29, 2026) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)). The Court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).

The party moving to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (citation omitted). The moving party need not "show initially that the agreement would be enforceable, merely that one existed." *Hines v. Overstock.com, Inc.*, 380 Fed. App'x 22, 24 (2d Cir. 2010) (emphasis omitted) (summary order). Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)).

"[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, N.A. v. VCG*

*Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (cleaned up). Where "there is a disputed question of material fact" as to formation of an agreement to arbitrate, the court holds a trial on that threshold issue before reaching the merits of the parties' dispute. *Barrows*, 36 F.4th at 49; *see also* FAA § 4.

## III. Discussion

### A. Existence of Agreement to Arbitrate

As the party seeking to compel arbitration, Zynga bears the burden to prove the existence of a valid agreement to arbitrate by the preponderance of the evidence. *See Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 700–01 (S.D.N.Y. 2017). The Court finds that Zynga has borne its burden of proving that it entered into valid agreements, including to arbitrate, with plaintiffs by virtue of plaintiffs' acceptance of the 2024 and/or 2025 Take-Two terms.

A user is bound to the terms of an online contract where "(1) a reasonably prudent person would be on inquiry notice of the terms, and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person would understand to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (cleaned up).

In resolving Zynga's motion to transfer, Judge Illston found that plaintiffs were on notice of, and assented to, the 2024 or 2025 Take-Two terms. *See* Dkt. 56 at 5 ("To reach any of the substantive issues the parties raise . . . the Court first must be assured that a valid contract was formed."). Noting that plaintiffs did not dispute that they accepted the 2024 and 2025 Take-Two terms, Judge Illston concluded that plaintiffs "all accepted the 2024 Take-Two terms and accepted but then opted out of (or attempted to opt out of) the 2025 Take-Two Terms," thereby forming valid agreements with Zynga. *Id*. at 3.

That conclusion is the law of the case, and should be disturbed only upon "clear conviction of error with respect to a point of law on which" it was predicated. *United States v.*

*Aquart*, 92 F.4th 77, 93 (2d Cir. 2024). It is also eminently supported, as the record demonstrates that plaintiffs were on notice of the terms and unambiguously assented to them. *See Edmundson*, 85 F.4th at 703.

As to notice, the terms appeared on a plain-colored background in front of a more colorful game screen. Ungberg Decl. ¶¶ 16–17. Hyperlinks to the terms appeared in blue, underlined font, and the text of the notice was proximate to the "ACCEPT" button. *Id*. That satisfies the requirement of inquiry notice. *See, e.g.*, *Edmundson*, 85 F.4th at 704 ("A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way."); *Hastings v. Nifty Gateway, LLC*, 724 F. Supp. 3d 241, 249 (S.D.N.Y. 2024) (notice is conspicuous where "Terms and Conditions" appeared in blue, with underlined links to the terms of use, and directly above "sign up" button); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830–31 (S.D.N.Y. 2020) (notice is conspicuous where text appears on contrasting background, with hyperlinks in darker, bolder font).

As to assent, plaintiffs undisputedly pressed the "ACCEPT" button when presented with the notice of the terms or of the terms' having been updated. *See* Ungberg Decl. ¶¶ 59–60, 66, 70. The pop-up text and "ACCEPT" buttons put plaintiffs on notice that their actions would result in an enforceable agreement, and a reasonable person would understand selecting "ACCEPT" to constitute assent. *See, e.g.*, *Edmundson*, 85 F.4th at 708 (user assented by clicking "Confirm and Continue" below statement of assent to terms); *Kelly-Starkebaum v. Papaya Gaming Ltd.*, No. 24 Civ. 2310, 2024 WL 5135799, at *7 (S.D.N.Y. Dec. 17, 2024) (reasonable consumer is "clearly warned" of assent where notice states that "[b]y continuing" he agrees to terms).

Each plaintiff is therefore bound by the version of the terms that they accepted, subject to any valid opt-out.

**B. Enforceability of Delegation Clause**

The 2024 and 2025 Take-Two terms[2] contain delegation clauses which, in identical language, grant the arbitrator "exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable." 2024 Terms § 15.5(1); 2025 Terms § 17.5(1). The terms vest the arbitrator with "authority to determine all threshold arbitrability issues, including related to whether the Agreement or the Arbitration Agreement are unconscionable or illusory." *Id*. Zynga seeks enforcement of the delegation clauses on the ground that they are encompassed by the parties' valid agreements. *See* Mot. at 19–21. Plaintiffs argue that California law applies, and that the delegation clauses are procedurally and substantively unconscionable. *See* Dkt. 74 ("Opp'n") at 9–14. Zynga responds that New York law applies, and that the delegation clause is not unconscionable. *See* Dkt. 79 ("Reply") at 2–6.

*a. New York law applies*

The 2024 and 2025 Take-Two terms are governed by New York law. *See* 2024 Terms § 15.1 ("This Agreement . . . shall be governed by, and construed under, the laws of the State of New York without regard to conflict of law rules."); 2025 Terms § 17.1 (same).

[2] The parties agree that Camargo and Garcia are bound by the arbitration agreement in the 2024 Take-Two terms, having opted out of the updates in the 2025 Take-Two terms. *See* Dkt. 62 ("Mot.") at 17 & n.6. The parties dispute whether Dougherty is bound by the arbitration provision in the 2024 or 2025 Take-Two terms. *See* Mot. at 17–18; Dkt. 74 ("Opp'n") at 19–20. The 2024 and 2025 Take-Two terms contain identical delegation provisions, which delegate questions of arbitrability to the arbitrator; as such, upon a finding of those clauses' enforceability, it is for the arbitrator to decide whether Dougherty validly opted out of the 2025 Take-Two terms.

New York courts "will generally enforce choice-of-law clauses." *DarkPulse, Inc. v. Crown Bridge Partners, LLC*, No. 22 Civ. 8163, 2026 WL 696787, at *5 (S.D.N.Y. Mar. 12, 2026); *see also Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006) ("Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction."). "Courts may refuse to enforce a choice-of-law clause only where (1) the parties' choice has no reasonable basis or (2) application of the chosen law would violate a fundamental public policy of another jurisdiction with materially greater interests in the dispute." *Reiff v. CyberRisk All., LLC*, No. 25 Civ. 6351, 2025 WL 3019938, at *2 (S.D.N.Y. Oct. 29, 2025) (cleaned up). No party argues that application of New York's unconscionability law would violate California's public policy, so the inquiry turns on whether the parties' agreement to apply New York law "has [a] reasonable basis." *Id.*

Plaintiffs argue that there is no reasonable relationship between this action and New York. Opp'n at 9–10 (citing *DarkPulse*, 2026 WL 696787, at *5, 7). Instead, they argue, California law applies, because (1) plaintiffs are or were California residents, (2) they bring causes of action under California consumer-protection law, (3) Zynga is headquartered in California, and (4) Zynga's "California-based executives and employees are directly responsible for Plaintiffs' injuries." Opp'n at 9–10. Zynga rebuts that its parent company, Take-Two—which is headquartered in New York and is a party to the terms—has "numerous subsidiaries and affiliates nationwide," and thus has an "interest in applying a uniform choice-of-law provision across all its subsidiaries." Reply at 2.

On this point, the Court holds with Zynga. Plaintiffs are right that California is the nexus of plaintiffs' relationship to the games, and that Zynga is a California-based corporation. *See* AC ¶ 17. But, given an explicit choice-of-law agreement, the "relevant inquiry is not . . . whether the

selected state is the state with the greatest number of connections to the parties or the transaction; rather, it is whether the relationship to the selected state is 'reasonable.'" *Frommer v. MoneyLion Techs. Inc.*, No. 23 Civ. 6339, 2025 WL 2751254, at *25 (S.D.N.Y. Sep. 29, 2025) (quoting *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 541 (S.D.N.Y. 2020)).

Take-Two, the originator of the terms and party to them, is headquartered in New York. Mot. at 6. Some "courts in this Circuit have deemed one party's incorporation in the state of the parties' chosen law sufficient for purposes of the 'reasonable relationship' test." *EMA Fin.*, 444 F. Supp. 3d at 541; *see also Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, 2019 WL 1322621, at *4 (E.D.N.Y. Feb. 28, 2019) (where plaintiff is "incorporated in Virginia," and parties agreed to Virginia choice-of-law clause in multiple transactions, "Virginia bears a reasonable relationship to the transactions" even though "Florida is the state with the most substantial contacts to this litigation"), *report and recommendation adopted*, 2019 WL 1317456 (E.D.N.Y. Mar. 22, 2019). It follows that the choice-of-law clause's election of the state in which a party to the agreement is headquartered should generally establish sufficient contacts as to be reasonable. *See, e.g.*, *Henry v. Major League Baseball Advanced Media L.P.*, No. 24 Civ. 1446, 2025 WL 3717068, at *8 (S.D.N.Y. Dec. 23, 2025) (New York "has sufficient contacts with the parties' transaction because 'Defendant is headquartered in New York'"), *report and recommendation adopted*, 2026 WL 45345 (S.D.N.Y. Jan. 7, 2026); *Stevens & Co. LLC v. Espat*, No. 24 Civ. 5223, 2025 WL 950989, at *8 (S.D.N.Y. Mar. 28, 2025) ("The contract has a reasonable relationship to New York, because [a party to it] is based in New York."), *reconsideration denied*, No. 24 Civ. 5223, 2025 WL 1425324 (S.D.N.Y. May 16, 2025).

Moreover, the parties entered multiple agreements, across the 2024 and 2025 Take-Two terms, both of which stated that New York law governed. *See Frommer*, 2025 WL 2751254, at

*25 (enforcing Delaware choice-of-law clause where "the parties entered multiple agreements invoking Delaware law or choosing Delaware as the forum for disputes"); *Power Up Lending Grp.*, 2019 WL 1322621, at *4 (enforcing Virginia choice-of-law clause where "the parties entered into two separate transactions, totaling four separate signed agreements, all stating that Virginia law governs").

Given Take-Two's New York headquarters and the parties' repeated, explicit agreement to a New York choice-of-law provision, that provision has a "reasonable basis." *Reiff*, 2025 WL 3019938, at *2. Upholding the New York choice-of-law provision "also makes practical sense," because Take-Two has an interest in the uniform interpretation of its policies, given its products' nationwide user base. *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17 Civ. 4819, 2018 WL 6786338, at *24 (S.D.N.Y. Oct. 25, 2018) ("Capstone and its state of incorporation, Delaware, have a substantial interest in the uniform interpretation of a Delaware-based equity plan and stockholders agreement with participants in multiple states."), *aff'd and remanded in part*, 796 Fed. App'x 55 (2d Cir. 2020) (summary order); *see also* Ungberg Decl. ¶ 38 (Take-Two applies its terms "across its full line of products").

*b. The delegation clause is enforceable under New York law*

"Parties may explicitly delegate to an arbitrator gateway issues of arbitrability, 'such as whether the arbitration clause applies to a particular dispute, or whether it is enforceable.'" *Marino v. CVS Health*, 698 F. Supp. 3d 689, 693–94 (S.D.N.Y. 2023) (quoting *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019)). When a contract delegates questions of arbitrability to an arbitrator, "the courts must respect the parties' decision." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The court's obligation to enforce a delegation clause is, of course, subject to "generally applicable contract defenses, such as fraud,

duress, or unconscionability." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

Plaintiffs here challenge the delegation clause as unconscionable, Opp'n at 10–14, which requires "a showing that the contract was both procedurally and substantively unconscionable when made." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988). "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121–22 (2d Cir. 2010) (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983)). Neither element is shown here.

As to procedural unconscionability, plaintiffs claim that the delegation clause is "part of" an "unconscionable contract of adhesion" containing "oppressive features" like "unilateral modification of the Terms . . . without prior notice." Opp'n at 11. This argument conflates a challenge to the conscionability of the arbitration agreement as a whole with a challenge to the delegation clause. But "[i]f the delegation clause is enforceable, the question of the agreement's enforceability otherwise must be left to the arbitrator." *Kelly-Starkebaum*, 2024 WL 5135799, at *8.

In any event, the terms' provision that users may opt out of the arbitration provision, including the delegation clause, dooms plaintiffs' argument that the terms are a procedurally unconscionable contract of adhesion. *See Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 525 (E.D.N.Y. 2017) ("An agreement is not procedurally unconscionable if there is a meaningful opportunity to opt out."); *Baginsky v. Zynga, Inc.*, No. 25 Civ. 1992, 2026 WL 810330, at *4 (S.D.N.Y. Mar. 24, 2026) (delegation clause not procedurally unconscionable where it was part of terms of service, which "a reasonably prudent smartphone user would understand" were

"connected to the creation of a user account," and included 30-day opt-out provision). Indeed, the Second Circuit, applying New York law, has found conscionability even where an agreement does not provide an opt-out. *See Ragone*, 595 F.3d at 122 (arbitration agreement is not procedurally unconscionable even where offered on a "take it or leave it basis" without an opt-out provision, and where plaintiff argued she had not read or understood it).

Plaintiffs' other arguments as to procedural unconscionability also fail. Plaintiffs principally argue that the terms provide insufficient notice of the delegation clause. Opp'n at 11–12. But notice of the arbitration clause appears on the first page of the terms, underlined and in bold. 2024 Terms at 2; 2025 Terms at 2; *see also Kelly-Starkebaum*, 2024 WL 5135799, at *9 (delegation clause not unconscionable where "document also includes as its very first paragraph a relatively short, bolded notification of the arbitration agreement and directions as to where the complete provision appears below"); *Coe v. Coca-Cola Co.*, 702 F. Supp. 3d 140, 158 (W.D.N.Y. 2023) (same, where arbitration provisions were "set out in the same font, size, and format as the rest of the Terms of Use provisions").

Plaintiffs further argue that the delegation clause's reference to "the arbitrator" breeds confusion because it does not "clearly specify whether the unconscionability issues should be decided by a JAMS arbitrator or a New Era arbitrator." Opp'n at 12. But it is clear on the face of the terms which rules will apply to which types of arbitrations. *E.g.*, 2024 Terms §§ 15.5(6) (assigning individual arbitration to JAMS and providing link to JAMS rules), 15.5(9) (defining mass arbitration, assigning mass arbitration to New Era ADR, and providing link to New Era rules). And the terms are not presented as urgent—they provide users "ample opportunity to read and study the provisions, to educate" themselves on their meaning, "and to consult a

lawyer." *Coe*, 702 F. Supp. 3d at 158 (denying procedural unconscionability argument based on lack of understanding of terms under such circumstances).

Plaintiffs finally argue that Zynga "deploys patented technologies to make the Games highly addictive" such that users "struggle to stop using them." Opp'n at 13. That avenue of attack is foreclosed by the Second Circuit's holding that "it is plain that [an arbitration agreement's being offered on a 'take it or leave it' basis] is not sufficient under New York law to render the [arbitration] provision procedurally unconscionable." *Ragone*, 595 F.3d at 122 (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (collecting cases)); *cf. Jacobson*, 2026 WL 1864990, at *12 (rejecting duress defense to Ticketmaster's arbitration agreement, under California law, where plaintiffs would "los[e] out on a concert ticket" if they refused to accede to the terms).

Plaintiffs' arguments as to substantive unconscionability are premised on the terms' incorporation of the New Era rules. Opp'n at 13–14. Plaintiffs rely on *Heckman v. Live Nation*, 120 F.4th 670 (9th Cir. 2024), where the Ninth Circuit, applying California law, affirmed a holding that Ticketmaster's arbitration agreement—which required mass arbitration to be administered under New Era's 2021 mass arbitration rules—was unconscionable. 120 F.4th at 688. The Ninth Circuit concluded that, "[r]ead together," Ticketmaster's terms and New Era's rules "represent a 'systematic effort to impose arbitration . . . as an inferior forum.'" *Id*. Salient here, the Ninth Circuit agreed that the terms' delegation provision itself was substantively unconscionable because of its incorporation of the relevant New Era rules then in effect. *Id*. at 687.

*Heckman* cannot support the weight plaintiffs would assign it. First, the 2024 Take-Two terms' mass arbitration procedures are the only subset of the terms' arbitration procedures that

enlist New Era, and they apply the New Era rules "in effect when the Mass Arbitration Disputes are filed." *See* 2024 Terms § 15.5(9). Since *Heckman*, New Era has addressed three of the four areas of substantive unconscionability that *Heckman* identified: "(1) the mass arbitration protocol, including the application of precedent from the bellwether decisions to other claimants; (2) procedural limitations, such as the lack of a right to discovery; (3) the limited right of appeal; and (4) the arbitrator selection provisions." *Heckman*, 120 F.4th at 683–84. The New Era procedures in effect as of January 2026 clarify that (1) bellwether decisions are accessible to all mass-arbitration claimants and are no longer binding; (2) parties always have the right to discovery; and (3) written decisions are required and no charge is imposed for detailed "reasoned" opinions. Mot. at 23. New Era's updated rules also provide that New Era will make "reasonable efforts to comply" with any state law requiring a different arbitrator selection process and may decline any case where New Era cannot without unreasonable burden accommodate state-law requirements. *See* New Era ADR Procedures (Jan. 1, 2026) at 12–13. In sum, the "new rules differ meaningfully from the old ones." *Jacobson*, 2026 WL 1864990, at *13. The 2024 Take-Two terms do not invoke the New Era Mass Arbitration Procedure analyzed in *Heckman*, and plaintiffs' claim that *Heckman* compels a finding of substantive unconscionability fails on that basis. *See id*. And even if plaintiffs had put forward meaningful alternative bases to find the updated New Era rules unconscionable, there is no mass arbitration currently pending, and the Court does not perceive a basis to wade further into hypothetical application of the terms to a future mass arbitration. *See* Mot. at 25.

Plaintiffs' other argument for substantive unconscionability—the only one addressed to individual arbitration—is that asking an arbitrator "to rule on the legitimacy of [its own service's] rules" presents a "massive and obvious conflict of interest." Opp'n at 14 (quoting

*Heckman*, 120 F.4th at 694 (VanDyke, J., concurring)). Followed to its logical conclusion, that proposition would render virtually all delegation clauses unenforceable. And it cannot be squared with the settled requirement that, unless a plaintiff proves that a delegation clause is unenforceable on its own terms, other questions of arbitrability—including defenses to contract formation—are left to an arbitrator under the terms of the delegation clause. *See Rent-A-Ctr.*, 561 U.S. at 72 (plaintiff challenging delegation clause must do so specifically); *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 118–19 (2d Cir. 2025) (same); *Jacobson*, 2026 WL 1864990, at *7 (same).

"[T]he Court need only find an absence of either procedural or substantive unconscionability in order to compel arbitration." *Nayal*, 620 F. Supp. 2d at 573 (citing *Gillman*, 534 N.E.2d at 828). The "absence of both forms" here "leaves no doubt" that the delegation clause is not unconscionable. *Id.* (emphasis omitted).

**CONCLUSION**

For the above reasons, the Court grants Zynga's motion to compel arbitration and dismisses its motion to dismiss as moot. The Court accordingly stays this action in its entirety, pending resolution of the arbitration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). The Court respectfully directs the Clerk of Court to terminate all pending motions and stay this case. The parties are directed to file a joint status update every 60 days as to the status of the arbitration proceeding.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: October 13, 2026
New York, New York